**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 24, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

J. SERGIO OJEDA-OJEDA,

Defendant-Appellant.

No. 07-2161
(D.C. No. 2:06-CR-1080-RB-2)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, **LUCERO**, and **TYMKOVICH**, Circuit Judges.

J. Sergio Ojeda-Ojeda ("Ojeda") appeals the sufficiency of the evidence

supporting his conviction on one count of possession with intent to distribute 100

kilograms or more of marijuana, in violation of 21 U.S.C. § 841(a)(1) and

(b)(1)(B)(vii), and one count of conspiracy to commit the same, in violation of

§ 846. Exercising jurisdiction under 28 U.S.C. § 1291, we conclude that the

evidence was sufficient to support Ojeda's conviction on both counts, and affirm.

---

[*] The case is unanimously ordered submitted without oral argument
pursuant to Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G). This order and
judgment is not binding precedent, except under the doctrines of law of the case,
res judicata, and collateral estoppel. The court generally disfavors the citation of
orders and judgments; nevertheless, an order and judgment may be cited under the
terms and conditions of 10th Cir. R. 32.1.

# I

In the early hours of May 3, 2006, agents from the Lordsburg, New Mexico station of United States Customs and Border Protection detected a pickup truck driving north on Power Line Road, in a sparsely populated area of southern New Mexico frequently used as a smuggling route. Although it was nighttime, the vehicle was being driven without the use of headlights. After receiving information about the truck by radio from another agent, Agent William Shafer waited in the dark in his patrol truck, alongside the same road. As the pickup approached him, Agent Shafer turned on his headlights and emergency lights. In response, the driver of the approaching truck immediately turned on his own headlights, abruptly made a 180 degree turn, and drove south at a high rate of speed. Agent Shafer promptly radioed to another agent south of his location. This agent, Jose Portillo, laid a set of tire-deflating spikes across the road. Minutes later, the fleeing truck crossed the area. Disabled by the spikes, the vehicle veered off the dirt road and came to a halt. By the time agents reached the truck, the occupants had fled on foot.

Agents described the truck as a green Chevrolet pickup with a covered bed. Apparently, the cover had become detached during flight, allowing the agents to see numerous bundles in the bed of the truck. Inside the cab, they saw similar packages stacked behind the front seats, partially covered by a large piece of some type of cloth. According to the agents, these packages could be seen from

the vantage point of the passenger's seat. Several agents testified that the truck smelled strongly of marijuana.

While Agent Portillo remained with the vehicle, Agent Shafer and others followed two sets of footprints leading away from the truck and eventually discovered defendant Ojeda and driver Mario Fidencio Reyna-Miguel ("Reyna") hiding under a bush approximately five miles from the abandoned vehicle. The two were arrested and taken to the Lordsburg station for processing, and the truck was towed to Lordsburg. In the ensuing search of the vehicle, no luggage was found. The bundles filling the vehicle were composed of marijuana and weighed a total of 389 kilograms; these, according to one agent, had a wholesale value of at least $600,000.

Both Ojeda and Reyna were interviewed twice at the Lordsburg station. On initial questioning by Agent German Gutierrez-Cisneros ("Agent Cisneros"), Ojeda stated that he knew Reyna from Asencion, Chihuahua, Mexico, and that Reyna had asked Ojeda to join him on an "errand" to Phoenix, Arizona. Ojeda explained that he expected to be paid for his assistance, but did not specify the nature of the errand or the amount of payment he expected to receive. He also stated that he did not know that the truck contained marijuana until Reyna began to flee from the border patrol truck, at which point Ojeda asked him why he was fleeing, and Reyna replied that the vehicle was full of marijuana. Ojeda did not

claim during this interview that Reyna was smuggling him into the United States, as he would later claim at trial.

Agent Cisneros then interviewed Reyna, who admitted to smuggling marijuana. Reyna told the agent that he and Ojeda had made arrangements for the trip in Asencion on the day before their arrest. Under these arrangements, Ojeda agreed to accompany Reyna to Phoenix as a passenger in the truck containing the marijuana, and would be paid for doing so. Reyna explained that he and Ojeda met at the loaded truck, and were jointly given instructions on how to get the truck to Phoenix. Reyna later testified that he and Ojeda were left in a cell together after this interview, during which time Ojeda asked Reyna to "help him out" by lying about Ojeda's knowledge of the marijuana. Ojeda added that "it would be better for just one of us to be in jail, not both of us."

Later that same day, Bureau of Immigration and Customs Enforcement Agent Alberto Chavez reinterviewed both men. Ojeda told Agent Chavez that he was accompanying Reyna on an errand to Phoenix, but would not specify the nature of the errand. He likewise claimed once again that he did not know about the marijuana until after Reyna began to flee from border patrol agents, admitting that he smelled a strange odor in the truck, but claiming that he did not recognize it as marijuana at the time. Ojeda then explained that he intended to stay in Phoenix with relatives and find a job there, but again, did not claim that he was paying Reyna to smuggle him into the United States. When Agent Chavez

- 4 -

interviewed Reyna, Reyna told him that Ojeda was "just a friend" from Asencion who was getting a ride to Phoenix, and that Ojeda knew nothing about the marijuana. Reyna testified at trial that this statement was untrue and was motivated by Ojeda's request to "help him out."

Ojeda and Reyna were indicted on one count of possession and one of conspiracy. In return for the government's promise to recommend a lower sentence, Reyna pled guilty on both counts and agreed to testify against Ojeda, who proceeded to trial. At trial, several agents who participated in the investigation testified to the facts discussed above. Reyna also took the stand, and provided testimony largely consistent with his original statement to Agent Cisneros. Reyna testified that he lived in Asencion, where a coworker, Rodrigo Enriquez, approached him and asked if he would be interested in smuggling a truckload of marijuana into the United States. Apparently Enriquez had planned to drive the vehicle himself but was unable to do so. Because he needed money for his mother's surgery and his wife's pregnancy, Reyna agreed to make the trip. Several days before the trip was scheduled, Enriquez picked him up at his home, and the two drove around town discussing the details. During this drive, the pair picked up Ojeda near the center of town. After Ojeda joined them in the vehicle, Enriquez told Reyna that Ojeda would accompany him on the trip, and told Ojeda that Reyna would be driving the truck.

Reyna further recounted that on May 2, 2006, Enriquez again picked him up at his home, and drove him to a place where the truck, loaded with marijuana, was located. On arrival at this location, the pair found Ojeda there waiting along with two others. Enriquez gave Reyna instructions on how to successfully drive across the border, and told Reyna that when he reached Phoenix, someone there would recognize the truck and take the marijuana. Reyna believed that Ojeda heard the conversation with Enriquez. Reyna insisted that he was not given certain crucial details about the delivery, such as "who these people were that were going to pick us up."

After receiving these instructions, Reyna and Ojeda set off for the border, the bundles of marijuana behind the seats within view. Reyna testified that they spoke very little during the drive. At one point, however, Ojeda remarked, "Let's hope we arrive in Phoenix all right and get back to Mexico."

In addition to Reyna's testimony and that of the investigating agents, the government also supported its theory of the case with circumstantial evidence. Agent Chavez testified as an expert on the smuggling of marijuana over the U.S.-Mexico border. He stated that, in his experience, drug smuggling operations often send a passenger along in a vehicle carrying a large load, in order to play the role of "caretaker"; that is, to help with any necessary vehicle maintenance, serve as a "lookout," and take turns driving. In some cases, the "caretaker" oversees a new driver and makes sure that monetary proceeds are returned.

- 6 -

Agents Chavez and Shafer also testified that drug- and immigrant-smuggling operations generally do not overlap, because it is more profitable for drug smugglers to fill vehicle space with more drugs than with would-be immigrants.

At the close of the government's evidence, Ojeda moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. He argued that the government had not produced sufficient evidence, as a matter of law, to support a finding that he constructively possessed the marijuana, a necessary element of the count of possession with intent to distribute. He also maintained that the government failed to show that he was interdependent with the members of the marijuana conspiracy, an element of the conspiracy count. The motion was denied in a bench ruling.

Ojeda then took the stand in his own defense and gave a very different story. He told the jury that he hoped to cross the border illegally to find work in Phoenix, where his cousins lived. With this goal in mind, he went to Asencion and inquired about a good "coyote," or immigrant smuggler. A woman in a bar identified Reyna as a coyote and introduced the two. Ojeda agreed to pay Reyna $1500 to smuggle him to Phoenix. About two weeks later, Reyna picked up Ojeda in the green truck and they set off for the border, planning to enter the United States in the "El Berrendo" region. Agents found no money, U.S. phone numbers, or U.S. addresses on Ojeda's person or in the truck, but Ojeda explained that he planned to call his wife in Mexico once he arrived in Phoenix, obtain his

cousins' phone number from her, and then call them to pick him up and pay Reyna's fee. He testified that he had no knowledge of the marijuana in the bed and cab of the truck and that he did not recognize its distinctive odor during the ride.

Following the close of the evidence, the jury returned a verdict of guilty on each count, and the court later sentenced Ojeda to 63 months' imprisonment and four years of supervised release. Ojeda now timely appeals his convictions, raising essentially the same sufficiency of the evidence arguments presented in his original Rule 29 motion.

**II**

We begin by examining the sufficiency of the evidence supporting Ojeda's conspiracy conviction under 21 U.S.C. § 846. We review de novo the sufficiency of the evidence to support a jury verdict, and the corresponding denial of a motion for judgment of acquittal. United States v. Vigil, 523 F.3d 1258, 1262 (10th Cir. 2008). Viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the government, we ask whether a reasonable jury could find the defendant guilty beyond a reasonable doubt. Id. Because Reyna's and Ojeda's testimony necessarily conflict, this standard requires us to accept Reyna's version of events over Ojeda's. Moreover, the jury's verdict reveals that it found Reyna to be the more credible witness, a

finding to which we defer on appeal. See United States v. Jameson, 478 F.3d 1204, 1210 (10th Cir. 2007).

In order to convict a defendant of conspiracy under § 846, the government must establish "(1) that two or more persons agreed to violate the law; (2) that the defendant knew the essential objectives of the conspiracy; (3) that the defendant knowingly and voluntarily took part in the conspiracy; and (4) that the conspirators were interdependent." United States v. Wright, 506 F.3d 1293, 1297-98 (10th Cir. 2007). Ojeda contends that the government failed to establish any of these elements, having proved only his bare presence in the truck.[1] Citing United States v. Anderson, 189 F.3d 1201, 1205 (10th Cir. 1999), he argues that the jury could have reached a verdict of guilt only by impermissibly "piling inference upon inference." We are not persuaded.

---

[1] In the court below, Ojeda challenged only the sufficiency of the evidence to support the element of interdependence between the alleged co-conspirators. He did not specifically question the evidence on the other three elements of the conspiracy count, as he now attempts to do on appeal. When reviewing a claim of insufficient evidence that was not properly raised at trial, we technically review that claim only for plain error. United States v. Cox, 929 F.2d 1511, 1514 (10th Cir. 1991). Nevertheless, because "a conviction in the absence of sufficient evidence of guilt is plainly an error, clearly prejudiced the defendant, and almost always creates manifest injustice," plain error review and de novo review are functionally equivalent so long as the fourth prong of plain error review—that the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings"—is also met. United States v. Goode, 483 F.3d 676, 681 & n.1 (10th Cir. 2007). Because we conclude that no error occurred in this case, we need not consider that prong.

"A jury can infer an agreement constituting a conspiracy from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." United States v. Scull, 321 F.3d 1270, 1282 (10th Cir. 2003) (quotations omitted). Such evidence was undoubtedly entered into the record, primarily through Reyna's testimony. Reyna told the jury that Enriquez, the same individual who recruited Reyna as a driver, introduced Reyna and Ojeda. He also stated that Enriquez told Ojeda that Reyna "was the one who was going to drive the truck." According to Reyna, Enriquez subsequently brought him to the location where the truck loaded with marijuana was waiting, and Ojeda was already on site for their journey. Enriquez then gave Reyna instructions, which he told the jury Ojeda could have heard, on how to drive the truck across the border. Enriquez explained to him that Reyna and Ojeda would be approached in Phoenix by individuals authorized to take the marijuana from them. These concerted actions establish that Enriquez, Reyna, and Ojeda agreed to violate the law by bringing the truck full of marijuana into the United States with the intent to distribute it there. The jury was not required to conclude otherwise.

The evidence also supports an inference that Ojeda knew the objective of this agreement—to possess and ultimately distribute 100 kilograms or more of marijuana. "To prove knowledge of the essential objectives of a conspiracy, the government does not have to show the defendant knew all the details or all the

members of a conspiracy. Rather, the government only needs to demonstrate the defendant shared a common purpose or design with his alleged coconspirators." United States v. Yehling, 456 F.3d 1236, 1240 (10th Cir. 2006) (quotation omitted). When Enriquez introduced Reyna and Ojeda and discussed the trip with them, Ojeda asked no questions about the purpose of the trip. This fact provides a strong inference that Ojeda already knew of that objective. On the day of their departure, Ojeda overheard the conversation about unloading the truck in Phoenix, and during the trip he told Reyna that he hoped they succeeded in getting back to Mexico. Ojeda's statement implies that he was aware that he was engaged in a risky journey which included a return trip to Mexico. This implication is buttressed by the fact that Ojeda brought no luggage along on the journey—an unlikely scenario if Ojeda's claimed intent to remain in Phoenix was genuine. A rational jury could well have concluded from these facts that Ojeda was familiar with the essential objectives of the drug conspiracy.

Sufficient evidence also supports the conclusion that Ojeda knowingly and voluntarily participated in the conspiracy. A "defendant's participation in or connection to the conspiracy need only be slight," United States v. Johnston, 146 F.3d 785, 789 (10th Cir. 1998), and "it is generally sufficient for purposes of a single-conspiracy finding that a conspirator knowingly participated with a core conspirator in achieving a common objective with knowledge of the larger venture," United States v. Eads, 191 F.3d 1206, 1210 (10th Cir. 1999) (quotation

omitted).  As Ojeda correctly notes, we have held that mere presence at the scene of a crime and flight from the police, standing alone, are not enough to support this element of a conspiracy conviction.  See United States v. Summers, 414 F.3d 1287, 1297 (10th Cir. 2005).  In the present case, however, there is considerable evidence of Ojeda's knowledge and voluntary participation beyond mere presence in and flight from the loaded truck.  Reyna testified that after their apprehension, Ojeda asked him to lie about Ojeda's involvement in the smuggling attempt.  From this, the jury could infer that Ojeda was aware of the truck's contents.[2]  Ojeda's own elusive statements to agents that he was accompanying Reyna on a paid "errand" could be interpreted by the jury as proof that Ojeda knew he was accompanying Reyna on a smuggling trip.  The jury was therefore entitled to reasonably conclude that this element of the crime of conspiracy was satisfied.

Lastly, although Ojeda argues that his presence in the truck did nothing to facilitate the conspiracy, and that there was no interdependence between the coconspirators, the evidence supports the jury's conclusion to the contrary.  "A defendant's activities are interdependent if they facilitated the endeavors of other alleged conspirators or facilitated the venture as a whole."  United States v.

---

[2] We do not disregard Ojeda's argument that an inference that he knew of the marijuana at the time he was interviewed is not probative of guilt, because he admittedly learned of the marijuana after Reyna began his vehicular flight from the border agents.  But a jury could infer that if his claims of belated knowledge were true, Ojeda would have had no reason to ask Reyna to lie on his behalf, since the truth would not be incriminating.

<u>Heckard</u>, 238 F.3d 1222, 1230 (10th Cir. 2001) (quoting <u>United States v. Ivy</u>, 83 F.3d 1266, 1287 (10th Cir. 1996)).  In this case, Reyna's testimony provided evidence of Ojeda's preexisting relationship with Enriquez.  The fact that a member of the conspiracy directed Ojeda's participation as a passenger implies that this role was important to the conspiracy's goals.  Moreover, Ojeda admitted during initial interviews that he would be paid for his role in the trip.  This fact supports a strong inference that Ojeda provided some service that furthered the goals of the conspiracy.  Finally, Reyna testified that he was not given complete information about how to dispose of the truck in Phoenix—the fifth largest metropolitan area in the country.  The likely inference to be drawn from this testimony is that Ojeda must have known the location of making the contact, and that his presence was therefore crucial to a successful delivery.  Based on this evidence, the jury could reasonably conclude that Ojeda's presence on the trip made him interdependent with other members of the conspiracy.[3]  In short, the

---

[3] The government relies heavily on agents' testimony about the common role of "caretaker" for large drug loads, arguing that Ojeda's presence as a passenger combined with such testimony is sufficient to provide an inference that Ojeda served as a caretaker, and thus to establish interdependence.  Ojeda counters that the agents' examples of the role a passenger might play cannot support more than a speculative inference that Ojeda himself played precisely such a role.  <u>Cf</u> <u>United States v. Dunmire</u>, 403 F.3d 722, 724-26 (10th Cir. 2005).  Because the jury could plainly infer, without speculation, that Ojeda's role as a passenger facilitated the conspiracy, we need not decide whether it was entitled to conclude that Ojeda served the exact function of a "caretaker."

evidence supports the jury's verdict that Ojeda conspired to possess marijuana with the intent to distribute it.

### III

Having resolved the sufficiency issue with respect to the conspiracy conviction, we turn to Ojeda's conviction for possession with intent to distribute 100 or more kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1). "To establish a violation of [§ 841(a)(1)], the Government must prove the defendant: (1) possessed the controlled substance; (2) knew he possessed the controlled substance; and (3) intended to distribute or dispense the controlled substance." United States v. Bowen, 437 F.3d 1009, 1014 (10th Cir. 2006) (quotation omitted). Ojeda challenges only the evidence supporting the first of these elements. Again, we disagree with his view of the evidence.

Possession may be established in two ways: The government may prove either that a defendant had actual, physical possession of the substance, or that he "constructively" possessed it. United States v. Reece, 86 F.3d 994, 996 (10th Cir. 1996). At issue in this case is the question of constructive possession. Such possession exists when a person "knowingly holds the power and ability to exercise dominion and control over [the contraband at issue]." United States v. Lopez, 372 F.3d 1207, 1211 (10th Cir. 2004) (citations omitted). "With regard to narcotics, we have defined constructive possession as an appreciable ability to guide the destiny of the drug." United States v. Ramirez, 479 F.3d 1229, 1250

(10th Cir. 2007) (quoting <u>United States v. Culpepper</u>, 834 F.2d 879, 881 (10th Cir. 1987)).  More than one individual may have constructive possession of the same contraband.  <u>Id.</u>

As one of two members of a drug conspiracy accompanying a load of marijuana to its destination, Ojeda surely had "an appreciable ability to guide the destiny" of the load.  For example, Reyna's testimony that he was not given full information about how to dispose of the truck in Phoenix provides an inference that Ojeda had this information.  Accordingly, the jury could infer that Ojeda had the ultimate ability to guide the load to its destination in Phoenix.  The government's evidence was therefore sufficient to show constructive possession of the drugs, and supported Ojeda's conviction for possession with intent to distribute.

## IV

For the reasons discussed, Ojeda's conviction is **AFFIRMED**.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge