FILED
United States Court of Appeals
Tenth Circuit

November 6, 2007

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

IMON WRIGHT,

      Defendant - Appellant.

No. 06-3063

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 04-CR-20101-CM)

---

Brent Anderson, Assistant United States Attorney, (Eric F. Melgren, United States Attorney and Tristram W. Hunt, Assistant United States Attorney, with him on the brief), Kansas City, Kansas, for the Plaintiff - Appellee.

William Dunn, Bonner Springs, Kansas, for Defendant - Appellant.

---

Before **TACHA,** Chief Judge, **HOLLOWAY** and **MURPHY**, Circuit Judges.

---

**HOLLOWAY,** Circuit Judge:

---

Defendant-appellant Imon Wright was convicted at jury trial of conspiracy to distribute and to possess with intent to distribute more than 50 grams of a mixture containing cocaine base, or crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and

846. He now brings this direct appeal, over which this court is given jurisdiction by 28 U.S.C. § 1291.

## I

Wright and two others were named in a six-count Superseding Indictment. Count 1, the conspiracy count on which Wright was convicted, charged that he had conspired with the two other named defendants, Kenneth Robinson and Jerry Robinson, along with other persons known and unknown. All three defendants were charged in Count 2 with possessing more than 50 grams of cocaine with intent to distribute, and in Count 3 with unlawfully possessing two pistols during and in relation to the conspiracy charged in Count 1. Count 1 alleged that the conspiracy existed from on or about April 27, 2004, to April 30, 2004. Counts 4 and 5 of the Superseding Indictment alleged drug crimes by Kenneth Robinson occurring in August and December, 2004, while Count 6 charged Kenneth Robinson with possessing an assault rifle in connection with the drug crime alleged in Count 5.

Both Kenneth Robinson and Jerry Robinson eventually entered guilty pleas to some of the charges against them. Jerry Robinson testified for the prosecution at Wright's trial, but Kenneth Robinson did not testify.

The jury returned a verdict of guilty on Count 1 but was unable to reach a verdict on Counts 2 and 3. Defendant was sentenced to 210 months' imprisonment to be followed by five years' supervised release, and ordered to pay a special assessment of $100.

## II

The investigation that led to these legal proceedings began when law enforcement

-2-

officials in Kansas City, Kansas, received information from a confidential informant that a house at 1035 Mildred (the Mildred house) in that city was a "crack house," a site of drug trafficking, particularly involving crack cocaine. Officers arranged for two confidential informants separately to go to the Mildred house and buy a $20 "rock" of crack cocaine on April 27, 2004. The confidential informants did not know the persons from whom they purchased the drug. When the confidential informants were later shown photographs of the three defendants, neither of them identified any of the three as a person they had seen on April 27, 2004 at the Mildred house.

Based on the controlled purchases of cocaine made on April 27, officers obtained a search warrant from a Kansas state court for the Mildred house, which they executed on the evening of April 30, 2004. As officers were assembling outside the house in preparation for executing the warrant, one of them realized that an occupant of the house had looked out and seen them. That officer alerted the others that their presence had been detected. The team then hurriedly effected their entry, with some officers using a ramming device to breach the front door, while others went to the rear to prevent any occupants from leaving.

Upon entering the Mildred house, Officer Gambrill, the first to enter, saw a black male, who quickly turned and ran down the hall to a bedroom. The man, later identified as Defendant Wright, was carrying two packages that the officer described as about the size of softballs. Officer Gambrill followed the fleeing man into the bedroom and heard a sound of breaking glass just before he reached the room. Entering the room, Officer Gambrill found two men lying on the floor; these were soon identified as Kenneth Robinson and Jerry

Robinson. Defendant Wright was standing by a broken window, the packages he had been carrying now on the floor at his feet. One of Defendant's hands was bleeding. The officer surmised that Defendant had broken the window in an attempt to throw the packages out of the house. The packages were later determined to contain crack cocaine, with a combined weight of just over 250 grams (a little over one-half pound). Officer Gambrill testified at trial that this quantity would make about 600 to 700 "doses" of crack.

The three occupants were arrested and searched. Each had a significant amount of cash on his person. Defendant Wright had about $921, Jerry Robinson had about $1,073, and Kenneth Robinson had over $4,000, most of which was not found until his shoes were searched at the police station. Jerry Robinson and Kenneth Robinson each had one twenty-dollar bill that had been marked by officers and used by the confidential informants in their purchases of crack on April 27th.

In the Mildred house the officers found two loaded pistols, both in the living room, one under a couch cushion and the other on a table. Officers also found marijuana (slightly more than two ounces), a set of scales, and plastic sandwich bags (which are often used in packaging small quantities of drugs) in the house. There was also a set of keys, which included one key that fit the lock on the door to the Mildred house and one that fit a Chevrolet parked outside. Kenneth Robinson told officers at the scene that the keys belonged to him.

Jerry Robinson testified at trial, and Agent Pamela Bennett testified on cross-examination by Wright's attorney about her questioning of Jerry Robinson and her written

-4-

report based on the interview. Jerry Robinson testified that he had known Defendant Wright since first grade or kindergarten. Jerry Robinson testified that he and Kenneth Robinson were cousins, and that Kenneth and Wright were close friends who "hung out" together. Jerry testified that Wright had lived at the Mildred house with his girlfriend, Mea Taylor, and their baby, but they had moved out in March of 2004. At the relevant time period of April 27 to April 30, 2004, no one was living at the Mildred house. The prosecution showed, however, that the electric service was still in the name of Mea Taylor at that time.

Jerry Robinson testified that he witnessed Kenneth Robinson and Defendant Wright sell "rocks," or small quantities of cocaine, to several persons who came to the front door of the Mildred house on April 29 and 30, 2004, just before the search warrant was executed. Officer Bennett had previously testified that Jerry Robinson had told her of witnessing such drug sales only on April 29, and not on April 30. Although Officer Bennett testified from her report that Robinson had told her that he had observed Wright selling only small quantities, when the search warrant was executed the officers did not find any of the drug packaged for such small sales.

Jerry Robinson testified that he never sold drugs from the Mildred house, instead making his sales in his own neighborhood. He regularly acquired the cocaine that he sold from Defendant Wright, purchasing two eight-balls every other day for the six months leading up to April 30, 2004. Officer Bennett, on cross-examination by Wright's attorney, agreed that Jerry Robinson had described his relationship with Wright as separate from the activity at the Mildred house. Jerry Robinson also denied at trial that he had been involved

in any conspiracy.[1]  Officer Bennett testified that Jerry did not admit having bought drugs from Kenneth Robinson and that, as far as she knew, Jerry was not dependent on Kenneth in any way.  However, Jerry Robinson did testify that he bought an eight-ball from Defendant Wright at the Mildred house on April 29.[2]

### III

### A

On appeal Wright challenges the sufficiency of the evidence of conspiracy.  We review the sufficiency of the evidence *de novo*, taking all of the evidence in the light most favorable to the jury verdict and drawing all  reasonable inferences that support the verdict. *See United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir. 1999).  To prove a conspiracy, the government must show (1) that two or more persons agreed to violate the law; (2) that the defendant knew the essential objectives of the conspiracy; (3) that the defendant knowingly and voluntarily took part in the conspiracy; and (4) that the conspirators were interdependent.  *See, e.g., United States v. Evans*, 970 F.2d 663, 668, 670 (10th Cir. 1992).[3]

---

[1]In fact, Jerry Robinson testified that he was not guilty of the charges in the indictment, although he admitted selling drugs for a living, and said that he had pleaded guilty only out of fear that he would be convicted in spite of his innocence.

[2]Apparently the official report that Officer Bennett had prepared summarizing this interview was less than explicit in relating that Robinson had said that this purchase was made at the Mildred house, and this purported ambivalence provides the context for an evidentiary issue discussed *infra*.

[3]At one point in its brief, the government states that these *are* the elements of a conspiracy under 21 U.S.C. § 846.  *See* Brief of Appellee at 21-22 (citing *United States v.*

Defendant Wright concedes that there was substantial evidence of unlawful activity and that he was implicated in dealing drugs. But he argues that there was insufficient evidence of an agreement to jointly pursue criminal activity, contending that the evidence showed no more than that he and others were independently trafficking in cocaine at the Mildred house and elsewhere. Similarly, he asserts that there was no evidence of interdependence among the alleged conspirators. Wright points to the lack of evidence that he and Kenneth Robinson got their cocaine from a common source. There was no evidence at all about the source for them, and the case agent who testified conceded that Kenneth Robinson could have gotten his cocaine independently of Wright. And while Jerry Robinson testified that he regularly purchased cocaine from Wright that he sold for profit, he made his sales in his own neighborhood. Wright contends that this shows that the three were operating independently. Independent criminal activity, even if the participants act in parallel, is insufficient Wright argues, relying on *United States v. Evans*, 970 F.2d 663 (10th Cir. 1992).

We conclude that the evidence was sufficient to support the conspiracy conviction. The conspiracy here was not the kind of far-ranging conspiracy that we faced in *Evans*. The Superseding Indictment alleged that the conspiracy lasted only a brief time, about four days,

---

*Riggins*, 15 F.3d 992, 994 (10th Cir. 1994)). But elsewhere in the brief, the government asserts that interdependency is not an element, but merely evidence of the necessary agreement, citing *United States v. DiPasquale*, 740 F.2d 1282, 1291 (3d Cir. 1984), and another case from that circuit. But this court has held many times, not just in *Evans*, that interdependency *is* an element of a criminal conspiracy. *See, e.g., United States v. McCullough*, 457 F.3d 1150, 1159, 1161 (10th Cir. 2006); *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990).

and involved only three people, Defendant Wright, Jerry Robinson, and Kenneth Robinson. On appeal, Defendant Wright correctly points out that the evidence to show that Kenneth Robinson acted in concert with the others was scant. The evidence showed that Kenneth Robinson and Imon Wright were close friends and that they sold crack cocaine from the same location on April 29 and April 30, which at least *tended* to show *some* "unity of purpose or a common design and understanding," *see United States v. Fox*, 902 F.2d at 1514, with the other two charged conspirators. But there was no evidence of the source of the cocaine sold by Kenneth Robinson and Wright, no evidence that they pooled resources (other than, perhaps, the Mildred house), and no other evidence of the nature of their business relationship, other than the fact that one of the utilities for the Mildred house was in the name of Wright's girlfriend. This is very thin. But assuming *arguendo* that the evidence was insufficient to show that Kenneth Robinson was a part of the conspiracy, we believe that the verdict still must be sustained.

A conspiracy requires only two persons.[4] We believe that the evidence sufficiently

---

[4]Application of this principle is not negated in this case by the doctrine known as "Wharton's Rule." "Wharton's Rule is that 'an agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission.'" *United States v. Rueter*, 536 F.2d 296, 298 (9th Cir. 1976) (quoting 1 R. Anderson, *Wharton's Criminal Law & Procedure* 191 (1957)). The crime of possession with intent to distribute does not require two persons, and so Wharton's Rule does not apply when that is the underlying crime charged. *Id.*

Moreover, the Rule "is merely 'an exception to the general principle that a conspiracy and the substantive offense that is its immediate end do not merge on proof of the latter'" and so "'has current vitality only as a judicial presumption, to be applied in the absence of legislative intent to the contrary.'" *United States v. Bommarito*, 524 F.2d

supported the inference that Defendant Wright and Jerry Robinson had an agreement to sell cocaine for profit. Jerry Robinson testified that he bought cocaine from Wright every other day for six months and sold it for profit in his neighborhood. The jury could easily infer from all the evidence that Wright was aware that Jerry was buying the drug in order to sell it for a profit. This buyer-seller relationship is patently an interdependent one.

We have many times said that proof of a buyer-seller relationship *without more* is insufficient to tie *the buyer* to a *larger* conspiracy. *See, e.g., Evans*, 970 F.2d at 673; *Fox*, 902 F.2d at 1514; *United States v. McIntyre*, 836 F.2d 467, 471 (10th Cir. 1987); *United States v. Watson*, 594 F.2d 1330, 1337 (10th Cir. 1979). But the government in this case did not charge a *larger* conspiracy. Nor is either Defendant Wright or Jerry Robinson in the position of the defendant in *McIntyre*, who made three purchases of cocaine which he shared with friends, but did not sell for profit, as far as the evidence showed. 836 F.2d at 471. In *Evans*, we held that the evidence was insufficient as to one defendant, Brice. Brice had made one purchase of four ounces of cocaine and once lent scales to two participants in the conspiracy to assist them in weighing some of the drug. The quantity purchased by Brice seems sufficient to support an inference that she intended to sell the drug, but the scope of the conspiracy charged by the government in that case was vast. Thus, although the evidence of Brice's purchase of four ounces was insufficient to support an inference that she had

---

140, 143 (2d Cir. 1975) (quoting *Iannelli v. United States*, 420 U.S. 770, 782 (1975)). The conspiracy in this case was charged under 21 U.S.C. § 846, which "supplements the general federal conspiracy statute" and accordingly authorizes prosecution "without the limitation imposed by Wharton's Rule . . . ." *Id.* at 144.

joined in that extensive conspiracy (alleged to have lasted at least three years and involved ten defendants and kilogram quantities of cocaine), in the context of the conspiracy charged in this case, Defendant Wright's sale to Jerry Robinson of a considerably smaller quantity was sufficient, we hold.

We have noted before that "the purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy." *United States v. Ivy*, 83 F.3d 1266, 1285-86 (10th Cir. 1996). *See also United States v. Gonzalez-Montoya*, 161 F.3d 643, 649 (10th Cir. 1998); *United States v. Flores*, 149 F.3d 1272, 1277 (10th Cir. 1998).

We conclude that the buyer-seller rule is no impediment to the conspiracy conviction in this case on these specific facts and that the evidence was sufficient to support the conspiracy conviction.

**B**

Wright challenges the decision of the district judge to deny his motion for production of the case agent's notes of her interview with Jerry Robinson, a motion that was made during trial when the case agent, Officer Pamela Bennett, testified that her notes supported a particular point she had made in her testimony. Counsel for Defendant Wright was cross-examining Bennett about her interview with Jerry Robinson. Bennett had testified that Jerry had told her that he had bought cocaine from Defendant Wright at the Mildred house the night before the raid. Wright's attorney asserted that her report did not say that. Bennett said

that the paragraph in question began with Jerry saying that he had gone to the Mildred house, so that it implied that the transaction later described in that paragraph also occurred there. The defense lawyer asked if she had any notes that would show this, and she said that she believed she did but her notes were on "her desk."[5]  Defense counsel moved for production of the notes, the prosecution objected, and the judge denied the motion.  Later in the trial, Jerry Robinson testified that he bought an eight-ball of cocaine from Wright at the Mildred house on April 29.

At trial, counsel for the government told the court that "there is a volume of case law in the Tenth Circuit dealing with an agent's notes that are used to then generate a report. Those are not discoverable, and they are not appropriate to be entered into evidence."  (III Aplt. App. 313.)  In its brief to this court, the government likewise asserts that "[t]he case agent's notes were not discoverable."  None of the "volume of case law" is cited as support for this assertion, which in any event is misdirected:  at issue here is not pretrial discovery, but a request for production of a document that a law enforcement official, testifying for the prosecution, identified in cross-examination as supportive of her testimony and that defense counsel asserted could contain valuable impeachment evidence.[6]

---

[5]Defense counsel apparently believed that Bennett was referring to counsel table in the courtroom, an interpretation that may not have been correct, but one which seemed to have been accepted at the bench conference.  The government's appellate brief states that the notes were at counsel table in the courtroom.  It makes no difference in our analysis whether the notes were in the courtroom or at the witness's office; we presume that they would have been available as a practical matter.

[6]We have not found authority to support the government's broad assertions in our research, nor do we believe that the cases cited in the government's supplemental

-11-

The trial judge did not explain the rationale for his ruling except to say that it was based on his understanding of "the law's position in regards to this issue . . . ." III Aplt. App. 315. In short, the reasons for the court's ruling and for the position taken by the government have not been provided to us. Instead, the trial court and the government offer only a conclusion, unadorned by rationale or authority. The government does, however, offer a cogent argument that any error was harmless.

Indeed, Defendant's position is only slightly better explained. Defendant insists that this point is "crucial" to resolution of the issue of the sufficiency of the evidence to support the conspiracy conviction. The necessary implication of this assertion, it seems, is that the possibility that Defendant Wright's sale to Jerry Robinson on April 29, 2004, occurred at some other location would severely weaken the inference of an unlawful agreement and/or of interdependence among the conspirators, as those are the contested elements on appeal. We may further presume that Defendant intends to imply that the possibility that the sale occurred elsewhere would strengthen his argument that his transactions with Jerry Robinson were separate from the charged conspiracy and insufficient, in themselves, to support the conspiracy conviction.

We have already rejected that argument. If we were to assume that, with the aid of the officer's notes of her interview, Defendant could have established as a fact that the sale

---

authority letter support the unqualified assertion. Before making such a contention again, counsel for the government would be well advised to undertake the research. Perhaps a useful beginning point would be *United States v. Sullivan*, 919 F.2d 1403, 1426-28 (10th Cir. 1990).

from him to Jerry Robinson on April 29 occurred at some location other than the Mildred house, we would still find the evidence sufficient to support this conviction.

If we consider the notes as possible impeachment evidence, we still find no material prejudice to the defense. In his cross-examinations of Officer Bennett and Jerry Robinson without benefit of the notes, counsel for Defendant skillfully brought out a number of inconsistencies, mostly involving portions of Jerry Robinson's testimony that were not included in Officer Bennett's report but which Jerry claimed to have told her in their pretrial interview. We cannot say that having one more inconsistency would have made a difference in the jurors' assessments of witness credibility.

Whether this issue is considered under the Jencks Act or under the *Brady* doctrine, the trial court's ruling can amount to no more than harmless error. Under the Jencks Act, 18 U.S.C. § 3500, Officer Bennett's notes could perhaps have been established to be a "statement" by Jerry Robinson if they were "substantially verbatim." *United States v. Smith*, 984 F.2d 1084, 1086 (10th Cir. 1993). We do not decide that issue. But under the Jencks Act, the defense is not entitled to such a prior statement of a government witness until that witness has testified at trial. In this case, Defendant Wright did not renew his motion for production of the notes after Jerry Robinson's testimony.

Thus, Defendant has not shown a violation of the Jencks Act because he did not make a proper request. Moreover, even if he had shown a violation of the Jencks Act, for the reasons we have set out we do not think that he could show prejudice.

Defendant's position is no better under the *Brady* doctrine. "Impeachment, as well

as exculpatory evidence falls within the rule, articulated in *Brady v. Maryland*, 373 U.S. 83 (1963), that suppression of material information favorable to the accused violates due process." *United States v. Gonzalez-Montoya*, 161 F.3d 643, 649 (10th Cir. 1998) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). "In order to establish a *Brady* or *Giglio* violation, 'the defendant bears the burden of establishing (1) that the prosecution suppressed the evidence, (2) that the evidence was favorable to the accused, and (3) that the evidence was material." *Gonzalez-Montoya*, 161 F.3d at 649. The element of materiality is satisfied "only if there is a 'reasonable probability' that the outcome of the trial would have been different had the evidence been disclosed to the defense." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

First, it seems highly unlikely that any member of the prosecution team who examined the officers' notes and report would have recognized that either one – or the two read in conjunction – included information that was exculpatory and so subject to the disclosure requirement of the *Brady* rule. Second, even if we were to find a *Brady* violation – and we have not – we would still reach the conclusion of harmless error. In spite of Defendant's failure to ask the trial court to make the notes at issue part of the record for this appeal, as we have already indicated we can determine, from the narrow purpose of Defendant's motion to produce the notes, that the notes would not have had a material effect on the outcome of this trial.

## C

Wright contends that he should be granted a new trial because of a prejudicial and

-14-

non-responsive reference by Officer Bennett to Wright's having been a fugitive. Our record does not tell us anything about the circumstances of Wright's fugitive status, except that we can infer that Bennett was referring to some time period after the execution of the search warrant at the Mildred house.

When this issue arose at trial, the prosecution had just shown, on re-direct examination of Officer Bennett, that the utilities for the Mildred house were in the name of Mea Taylor. Jerry Robinson would later testify that Mea Taylor was Defendant Wright's girlfriend, but the prosecution apparently wanted Agent Bennett to say that Mea Taylor was Defendant's girlfriend. No foundation was established to show that Agent Bennett had personal knowledge of this fact, so the questions seem to have been intended to elicit hearsay, as Defendant pointed out to the trial judge. Thus, when the agent was first asked if she had "information from other sources" about the relationship, defense counsel objected.

The prosecutor then asked a similar question, phrased as "Where else did you learn that the defendant had a relationship with Mea Taylor?" Defense counsel again objected. The prosecutor said he was only asking if Officer Bennett knew from any other source about the relationship. The judge said that was a proper question, and "Beyond response, you can raise your objection again." Officer Bennett then said that "*while Imon Wright was a fugitive*, the United States [Marshal's] Service received information that Mea Taylor was his girlfriend, that they had a child together." (Emphasis added.)

Defense counsel then moved for a mistrial. The judge determined that the response was improper but said that he did not believe that it had been elicited in bad faith. The judge

instructed the jury not to consider the remark and denied the motion for mistrial.

Aside from setting out the testimony and the circumstances, Defendant's appellate brief makes no real argument, instead only asserting the conclusions that the officer must have deliberately inserted the reference to his fugitive status (and the fact that he had a child with his girlfriend) and that the curative instruction could not have dissipated the unfair prejudice. The government concedes that the remark was improper but contends that the district court did not err in denying the motion for new trial because the remark was inconsequential when viewed in the context of full trial, citing *United States v. Meridyth*, 364 F.3d 1181 (10th Cir. 2004). We agree.

The jury heard evidence that the Mildred house was a crack house. The evidence showed considerable trafficking activity at that location, and Defendant was shown to have lived there until just a few weeks before the events covered at trial. Defendant was shown to have had two large packages of crack cocaine in his hands when the police entered, and Jerry Robinson testified that he had purchased crack from Defendant every other day for six months. Not only that, but Jerry Robinson admitted that selling the crack he obtained from Wright was his source of income. And the quantities in Defendant's possession when the police entered the Mildred house were shown to be enough for hundreds of individual "doses" of the drug. In the light of all this evidence, we agree that the passing reference to Defendant having been a fugitive was inconsequential.

**D**

Finally, Wright contends that the district judge erred in denying his application for

leave to interview a juror. Immediately after the jury verdict was returned, the jury foreperson approached defense counsel in the hallway and appeared to be very upset. The judge apparently saw her approach the lawyer and immediately called them back into the courtroom. The judge reminded them both that a local rule provides that no attorney (or party) is to talk to any juror without advance permission of the court. The judge also interviewed the juror in chambers. The defense then filed a motion asking for leave to interview the juror and saying only that the court presumably knew what the juror had wanted to say. The judge issued a written order noting the limitations on admissibility of juror testimony and stating that, based on his interview with the juror, the discussion would be inadmissible information about the jury's internal process. Counsel was denied leave to interview the juror.

Defendant's brief describes the juror as "very distraught" and obviously concerned about the outcome of the trial. The juror was the only African-American on the jury, and Defendant is African-American.

District courts have "wide discretion" to restrict contact with jurors to protect jurors from "fishing expeditions" by losing attorneys. *Journal Pub. Co. v. Mechem*, 801 F.2d 1233, 1236 (10th Cir. 1986). This court has held that a trial judge is well within his discretion in denying leave to inquire of jurors where there was no claim of external interference with the process. *United States v. Miller*, 806 F.2d 223, 225 (10th Cir. 1986).

We certainly see no abuse of discretion in this case, where the trial judge interviewed the juror and made a finding that the interview yielded nothing that would have been

admissible in evidence under Fed. R. Evid. 606(b).[7] We note that counsel did not ask for a record to be made of the judge's interview.

## IV

In sum, we are convinced that the Defendant has not demonstrated that any reversible error occurred in connection with these proceedings. Accordingly the judgment is AFFIRMED.

---

[7]The reference to admissibility in evidence seems clearly to have been in anticipation of a motion for new trial, the obvious path for use of a juror's testimony post-trial.