FILED
United States Court of Appeals
Tenth Circuit

**March 3, 2009**

Elisabeth A. Shumaker
Clerk of Court

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

AARON DALE POE,

      Defendant-Appellant.

No. 07-6237

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CR-06-300-F)**

---

William P. Earley, Assistant Federal Public Defender, Federal Public Defender Office, Oklahoma City, Oklahoma, for the Defendant-Appellant.

Chris M. Stephens, Assistant United States Attorney (John C. Richter, United States Attorney, and Sanford C. Coats, Assistant United States Attorney, with him on the briefs), Office of the United States Attorney, Oklahoma City, Oklahoma, for the Plaintiff-Appellee.

---

Before **BRISCOE**, **McWILLIAMS**, and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

      This case requires us to answer a question of first impression in this

Circuit:  Do bounty hunters constitute state actors for purposes of the Fourth

Amendment when they conduct a search in the course of seeking out a bail-jumper? We conclude that bounty hunters do not qualify as state actors when, as here, they act without the assistance of law enforcement and for their own pecuniary interests.

Aaron Dale Poe was apprehended by bounty hunters after he jumped bail in an Oklahoma state criminal case. In the home where Poe was found, the bounty hunters discovered drugs, drug-related paraphernalia, and a loaded firearm. Poe was later convicted by a jury on three counts: possession of a firearm and ammunition after a previous felony conviction, possession of methamphetamine with intent to distribute, and possession of a firearm in furtherance of a drug trafficking crime. The district court sentenced Poe to 165 months' imprisonment followed by ten years' supervised release.

On appeal, Poe raises four challenges. First, he claims that the district court erred in denying his motion to suppress because the bounty hunters were state actors conducting a warrantless search in violation of the Fourth Amendment. Second, he asserts that the government presented insufficient evidence to convict him on each of the three counts. Third, he disputes the procedural reasonableness of his supervised release sentence, arguing that the district court improperly calculated the advisory Guidelines range and departed from that range without advance notice. Finally, he challenges application of an

obstruction of justice enhancement based on his trial testimony. Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we affirm.

# I

# A

On August 3, 2006, a bail bonds company hired five bounty hunters to apprehend Poe for jumping bail in an Oklahoma state criminal case. The bounty hunters surveilled the home of Kim Wilson, who they believed to be Poe's girlfriend.[1] Around 10:30 p.m., the bounty hunters observed Wilson exit her house and drive away. Two of the bounty hunters, David DeWitt and Lawrence Sanders, followed her to the AutoZone where she worked to question her about Poe. Wilson indicated that Poe was at her home and agreed to return with DeWitt and Sanders so they would not have to kick in her door.[2]

During this conversation, the bounty hunters obtained additional information from Wilson. First, she told them that Poe was planning to sell drugs

---

[1] The record is somewhat inconsistent as to Poe and Wilson's exact relationship. Poe provided Wilson's address to Oklahoma authorities when he posted the bond for the Oklahoma state case. At the hearing on Poe's motion to suppress in the present case, ATF Agent Karen Hess testified that Wilson was Poe's current girlfriend. At trial, one of the bounty hunters similarly testified that Poe and Wilson were still in a relationship. Others, including Poe himself, testified that Wilson was an ex-girlfriend. In denying the motion to suppress, the district court found that Wilson was Poe's ex-girlfriend, and we adhere to that finding.

[2] However, Wilson did not give consent for the bounty hunters to search her home at this time. Later, after a police officer arrived, Wilson consented to a search of the entire house.

from her house that night. Second, she disclaimed knowledge of any drugs in the house other than those Poe planned to sell. Third, she said there was a silver gun in the house.

Upon returning to the house, DeWitt and Sanders staked out the back door, while the other bounty hunters watched the front. A car pulled up and an individual, later identified as Chris McGill, exited the car and walked to the back door. After McGill knocked, Poe let him in. From their position, DeWitt and Sanders were able to positively identify Poe.

DeWitt and Sanders approached the back door and observed that McGill was already leaving. As McGill opened the door to leave, DeWitt ordered him to sit on the ground. Sanders went into the home to apprehend Poe, and a struggle ensued. As Sanders wrestled Poe to ground, two pit bulls entered the room and attacked Sanders. Sanders "tased" one of the pit bulls, then both dogs retreated to another room and Poe gave up resisting.

After Poe was subdued, DeWitt observed in plain view in the same room what he believed to be methamphetamine, methamphetamine-related paraphernalia, and a black nine-millimeter pistol. DeWitt emptied the pistol's chamber and removed its magazine, both of which were loaded. Sanders then called the Oklahoma City Police Department.

Officer James Geery of the Oklahoma City Police Department responded to Sanders's call, arriving at Wilson's home shortly after 11:00 p.m. After speaking

- 4 -

with the bounty hunters, Officer Geery advised Poe of his <u>Miranda</u> rights. Poe said that he understood his rights, and before Officer Geery asked him another question Poe said, "The dope and the gun are mine."

Officer Geery requested permission to search the home. Poe replied that he could not consent because it was not his home. Asked why he was at Wilson's house, Poe explained that he and Wilson dated for about a year and half, during which time he lived with her, but that they had broken up about a month earlier. He also stated that he had "finagled" a key from Wilson prior to moving out. At trial, Poe elaborated on his relationship with Wilson, explaining that after he moved out, he continued to return to the house to shower, shave, change clothes, and eat. Wilson knew that Poe had a key, and she never said or did anything to indicate that Poe lacked her permission to be there.

At the scene, Poe also admitted to Officer Geery that he sold drugs to McGill in the past and would have sold drugs to McGill that night if there had been enough time.[3] He reiterated that the gun and drugs belonged to him and not Wilson, and he explained that he obtained the gun two months earlier in exchange for drugs.

---

[3] We note that at trial Poe disputed making this statement, which does not appear in Officer Geery's written report. But, as we must, we view the evidence in the light most favorable to the jury's verdict. <u>United States v. Wright</u>, 506 F.3d 1293, 1297 (10th Cir. 2007).

Officer Geery obtained verbal and written consent from Wilson to search the home.[4]  During the search, Officer Geery discovered that the home had a video surveillance system that allowed the occupants to monitor the front porch, the driveway, and the approach to the back of the house.  He also recovered physical evidence, including:  the gun DeWitt had unloaded, a nine-millimeter Makarov semi-automatic pistol; eleven rounds of .380 caliber ammunition; a bag containing 6.9 grams of methamphetamine; a bag containing 2.3 grams of methamphetamine; a bag containing 3.1 grams of methamphetamine; a set of digital scales; and a box containing approximately 200 Ziploc bags ranging in size from one-and-one-half to three inches square and a set of manual scales.  Upon finding this incriminating evidence, Officer Geery arrested Poe.  McGill was also arrested on the basis of outstanding warrants.

Evidence establishing the above facts was presented at trial.  In addition, Oklahoma City Police Officer Mark Danner testified as a drug expert.  He testified that pit bulls and video surveillance are commonly employed by drug dealers.  Danner also opined that the amount of drugs and related paraphernalia (scales and bags) were consistent with distribution.  Finally, he described the street value of methamphetamine and explained the connection between firearms and drug transactions.

---

[4] Although Wilson consented to the search of the entire home, Officer Geery only searched the room in which the bounty hunters apprehended Poe.

Poe presented three witnesses in addition to testifying in his own defense.[5] The essence of Poe's defense was that he and Wilson had been using drugs prior to Wilson's departure for work. According to Poe and his witnesses, it was Wilson who dealt drugs; Poe had been unaware that McGill was coming over that night; and the purpose of McGill's visit was to lend Wilson money, not to buy drugs.[6] Poe specifically denied intent to distribute drugs and possession of the firearm.

**B**

Prior to trial, Poe moved to suppress all evidence discovered by the bounty hunters on August 3. He argued that under the Fourth Amendment, the bounty hunters were state actors conducting an unreasonable warrantless search. Therefore, any evidence obtained by Officer Geery should be suppressed as the fruit of the bounty hunters' unconstitutional search. The district court denied the motion to suppress, concluding that Poe lacked Fourth Amendment standing because he had no reasonable expectation of privacy in Wilson's home. Although the issue was fully briefed, the district court explicitly declined to decide whether the bounty hunters were state actors.

---

[5] Also, Poe stipulated that he had a prior felony conviction and that the firearm and ammunition at issue had traveled in interstate commerce.

[6] When Officer Geery arrested Poe and McGill, he found about $11 on Poe and $379 on McGill.

In March 2007, the jury convicted Poe on three of four counts: (1) possession of a firearm and ammunition after a previous felony conviction, in violation of 18 U.S.C. § 922(g)(1) ("Count 2"); (2) possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) ("Count 3"); and (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) ("Count 4").[7] Prior to sentencing, a probation officer prepared Poe's presentence report ("PSR").

In calculating Poe's offense level, the PSR included a two-level enhancement for obstruction of justice. See U.S.S.G. § 3C1.1. The PSR also included calculations regarding supervised release. The probation officer calculated an advisory United States Sentencing Guidelines ("Guidelines") range of two to three years' supervised release on Count 2. § 5D1.2(a)(2); see 18 U.S.C. § 3583(b)(2) (authorizing "not more than three years" of supervised release). On Count 3, she calculated an advisory range of six years' supervised release. U.S.S.G. § 5D1.2(c); see 21 U.S.C. § 841(b)(1)(C) (mandating "at least six years" of supervised release). Finally, on Count 4, she calculated a range of three to five years' supervised release. U.S.S.G. § 5D1.2(a)(1); see 18 U.S.C. § 3583(b)(1) (authorizing "not more than five years" of supervised release).

---

[7] The indictment also charged Poe with one count of possession of ammunition after a previous felony conviction, in violation of 18 U.S.C. § 922(g)(1), based on a January 27, 2006 incident ("Count 1"). All four charges were tried together, but the jury acquitted Poe of Count 1.

At the sentencing hearing, the parties discussed the <u>statutory</u> supervised release range for Count 3.  Because Poe had a conviction for a prior felony drug offense, 21 U.S.C. § 841(b)(1)(C) directed the district court to "impose a term of supervised release of at least 6 years in addition to [the] term of imprisonment." The district judge inquired as to the "top end on that."  Counsel for both the government and Poe admitted they did not know the answer,[8] and the probation officer stated that she had not "seen a Court do more than six years when it says no less than six years on this type of case."  Although the PSR reported the advisory Guidelines range was six years in accordance with 21 U.S.C. § 841(b)(1)(C),[9] the district court never explicitly stated what it considered to be the applicable Guidelines range.

Ultimately, the district court imposed a sentence of 165 months' imprisonment, consisting of concurrent 105-month sentences on Counts 2 and 3 and a consecutive 60-month sentence on Count 4.  In addition, the district court imposed a ten-year term of supervised release, consisting of concurrent terms of

---

[8] In fact, defense counsel stated his belief that 21 U.S.C. § 841(b)(1)(C) was a mandatory minimum.

[9] Under the Guidelines, the term of supervised release shall be "[a]t least three years but not more than five years for a defendant convicted of a Class A or B felony," U.S.S.G. § 5D1.2(a)(1), but "[t]he term of supervised release imposed shall be not less than any statutorily required term of supervised release," § 5D1.2(c).

three years on Count 2, ten years on Count 3, and five years on Count 4. This appeal followed.

On appeal, Poe challenges the denial of his motion to suppress, the sufficiency of the evidence as to all counts, the procedural reasonableness of the ten-year supervised release term, and the application of the obstruction of justice enhancement.

## II

Poe challenges the denial of his motion to suppress the evidence seized at Wilson's home on August 3. He argues that the evidence is the fruit of an unreasonable warrantless search in violation of the Fourth Amendment because he had a reasonable expectation of privacy in Wilson's home, and because the actions of the bounty hunters were fairly attributable to the state. In denying his motion, the district court concluded that Poe's status in the home was "little higher than a trespasser," and he therefore lacked standing to mount a Fourth Amendment challenge.

We review de novo both the threshold question of whether Poe has standing to challenge the search and the ultimate question of whether the search violated the Fourth Amendment. United States v. Rhiger, 315 F.3d 1283, 1285, 1287 (10th Cir. 2003). In reviewing the district court's ruling on the motion to suppress, we view the evidence in the light most favorable to the government. Id. at 1287. We look first at the evidence introduced at the hearing on the motion to

suppress, although our review is not limited to that evidence.  See United States

v. Parra, 2 F.3d 1058, 1065 (10th Cir. 1993).

Employing these standards, we conclude that, contrary to the district

court's ruling, Poe had a reasonable expectation of privacy at Wilson's home.

But because the bounty hunters were acting without governmental assistance and

for their own pecuniary interests, we hold that they were not state actors for the

purposes of the Fourth Amendment under United States v. Souza, 223 F.3d 1197,

1201 (10th Cir. 2000).

## A

It is well-established that "the Fourth Amendment is a personal right that

must be invoked by an individual."  Minnesota v. Carter, 525 U.S. 83, 88 (1998);

see United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990).

Therefore, a defendant raising a Fourth Amendment challenge must first

demonstrate that he has standing to object to the search.  Rubio-Rivera, 917 F.2d

at 1274.  Standing requires the defendant to show "that he had a subjective

expectation of privacy in the premises searched and that society is prepared to

recognize that expectation as reasonable."  Rhiger, 315 F.3d at 1285 (quoting

United States v. Higgins, 282 F.3d 1261, 1270 (10th Cir. 2002)).

At the hearing on Poe's motion to suppress, the district court concluded

that the evidence presented "d[id] not give the Court any sufficiently concrete

basis upon which to find that this defendant was settled in this location in any

way that approaches the circumstances that would have to be found to exist in order for the Court to conclude that he had an expectation of privacy." In light of the uncontroverted evidence from the suppression hearing that Poe was a social guest at Wilson's home, we reach the opposite conclusion.

An individual does not have to be "settled" at a location to have a reasonable expectation of privacy; a simple overnight guest has Fourth Amendment standing. Minnesota v. Olson, 495 U.S. 91, 96-97 (1990). Yet, not every individual "legitimately on the premises" has such a reasonable expectation. Carter, 525 U.S. at 91. In Rhiger, this court considered the middle ground between Olson and Carter and held that a social guest who does not stay overnight has a reasonable expectation of privacy. 315 F.3d at 1286. Unlike the defendant in Carter, who was present for "purely commercial" reasons, a social guest has a "degree of acceptance into the household." Id. at 1286 (quoting Carter, 525 U.S. at 90). Here, the evidence presented at the suppression hearing shows that Wilson accepted Poe in her home as just such a social guest.

Until Wilson departed for work, she and Poe were in the home together for the entire time of the bounty hunters' surveillance. When she left, after 10:00 p.m., she permitted him to remain. Until a month earlier, Poe had lived at the residence with Wilson. He had lived there for a year and a half and, with her knowledge, had a key. She knew that Poe was expecting a drug customer at the house. Wilson shared all of this information with the bounty hunters and never

indicated that she did not want Poe in the house or that he was there without her permission. Further, Poe was a regular visitor since he had moved out, and the bounty hunters witnessed Poe invite another visitor into the house. Each of these factors weighs in favor of concluding that Poe had "an ongoing and meaningful connection to [Wilson's] home as a social guest." Rhiger, 315 F.3d at 1287.[10]

The government emphasizes that Poe had "finagled" his key to the house and told Officer Geery he did not have permission to "stay" there. These factors would be relevant if there were a dispute over whether Poe was in Wilson's home with her knowledge and consent, but there is not: Wilson was in the home with Poe until she left for work and permitted him to remain there late at night. To have Fourth Amendment standing, a social guest need not have permission to enter the residence alone or to stay overnight.[11]

_____

[10] If evidence developed at trial supported the district court's ruling on the motion to suppress, we could uphold the ruling on that basis. See Parra, 2 F.3d at 1065. In this case, however, the evidence presented at trial weighs even more heavily in favor of Poe's argument. Poe testified that Wilson had not wanted him to move out, he kept clothes there, and he regularly visited the home since moving out to "shower, shave, change clothes, [and] eat." He came and went as often as three times a week. Before Wilson left for work, she and Poe had been using drugs together and may have had sex.

[11] The government cites United States v. Denny for the proposition that when Poe told police it was not his home and he could not consent to a search, he "disclaimed ownership" and "relinquished" his reasonable expectation of privacy. 441 F.3d 1220, 1227 (10th Cir. 2006). Abandonment of an object, the issue in Denny, is not relevant to our analysis here. An overnight or social guest, squarely protected by the Fourth Amendment, does not relinquish that protection by truthfully stating that he does not own the home he is visiting.

Applying de novo review, we conclude that Poe had a "degree of acceptance into the household," Rhiger, 315 F.3d at 1286, and an "ongoing and meaningful connection to [Wilson's] home," id. at 1287, establishing his status as a social guest. Therefore, contrary to the district's ruling, Poe had a reasonable expectation of privacy in Wilson's home on the night of August 3 and standing to mount a Fourth Amendment challenge.

**B**

Because we conclude that Poe has standing to object to the search, we must decide a question the district court did not reach: Whether the bounty hunters were state actors within the meaning of the Fourth Amendment.[12] The Fourth Amendment guards against unreasonable searches and seizures by state actors. Burdeau v. McDowell, 256 U.S. 465, 475 (1921). When a private individual conducts a search not acting as, or in concert with, a government agent, the Fourth Amendment is not implicated, no matter how unreasonable the search. United States v. Jacobsen, 466 U.S. 109, 113 (1984). "However, in some cases a search by a private citizen may be transformed into a governmental search implicating the Fourth Amendment if the government coerces, dominates or

---

[12] Although the district court did not decide the state action question, the parties fully briefed the issue, and the record is sufficiently developed to allow us to decide it. See United States v. Sandia, 188 F.3d 1215, 1217-18 (10th Cir. 1999) ("[W]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." (quotation omitted)).

- 14 -

directs the actions of a private person conducting the search or seizure." United

States v. Smythe, 84 F.3d 1240, 1242 (10th Cir. 1996) (quotation omitted).

We use a dual-pronged inquiry to decide if a search by a private individual

constitutes state action within the meaning of the Fourth Amendment. Souza, 223

F.3d at 1201; see also Smythe, 84 F.3d at 1242-43; Pleasant v. Lovell, 876 F.2d

787, 797 (10th Cir. 1989). First, we determine "whether the government knew of

and acquiesced in the [individual's] intrusive conduct." Souza, 223 F.3d at 1201

(quotation omitted). Second, we consider "whether the party performing the

search intended to assist law enforcement efforts or to further his own ends." Id.

(quotation omitted). Both prongs must be satisfied considering the totality of the

circumstances before the seemingly private search may be deemed a government

search. Id. (citation omitted).[13]

The bounty hunter's search of Wilson's residence does not satisfy either

prong of the Souza inquiry. Poe does not and cannot assert that the government

"knew of or acquiesced in" the bounty hunters' entry and search of Wilson's

home. Souza and Smythe are instructive. In Souza, this court held that a search

by a private delivery service employee amounted to a government search for

Fourth Amendment purposes because it was instigated and encouraged by Drug

---

[13] The parties cite United States v. Alexander, 447 F.3d 1290 (10th Cir. 2006), for this standard. Although Alexander is more recent than Souza, we rely on Souza because Alexander did not modify the standard, but rather applied it to a Fifth Amendment challenge. Id. at 1294-95.

Enforcement Agency ("DEA") agents. 223 F.3d at 1202. The DEA agents identified the item they wanted searched, set it aside, and repeatedly encouraged the employee to open it. Id. In contrast, in Smythe, a bus station manager searched a box he feared contained dangerous materials after he called the police and the responding officer advised him that he could legally open the box. 84 F.3d at 1243. This did not constitute a government search. Id. Noting that "the police in no way instigated, orchestrated or encouraged the search," we held that "if a government agent is involved 'merely as a witness,' the requisite government action implicating Fourth Amendment concerns is absent." Id. (citation omitted). Before us, it is undisputed that the police did not become involved until Sanders called them, after he and DeWitt had entered Wilson's house, apprehended Poe, and discovered the firearm, drugs, and paraphernalia. As with a "mere witness," this after-the-fact involvement of the police does not implicate the Fourth Amendment.

Poe argues that "Oklahoma's extensive statutory regulation of the bail bonds industry, coupled with conferring the powers of arrest, conclusively establishes the bondsmen's conduct is chargeable to the State." Aplts. Br. at 27. However, involvement in the bail bonds industry is insufficient to satisfy this inquiry; we require knowledge of or acquiescence in the challenged search. Because the government agent did not know of the bounty hunters' search until

after it was complete, Poe's challenge fails under the first prong of <u>Souza</u>. <u>See</u> 223 F.3d at 1201.

Further, Poe cannot establish <u>Souza</u>'s second prong because the bounty hunters primarily "intended . . . to further [their] own ends"—their financial stake in Poe's bail—rather than to assist state officials. These bounty hunters were hired to apprehend Poe by the bail bonds company, which was responsible for the bond it posted on Poe's behalf. Poe's argument that law enforcement and the bail bonds industry have a "symbiotic relationship," Aplts. Br. at 27, is unpersuasive. We do not inquire if the police benefitted from the private conduct, but if the bounty hunters had a "legitimate, independent motivation" to conduct the search. <u>Smythe</u>, 84 F.3d at 1240. Financial gain motivated these bounty hunters; they had apprehended Poe and completed the search <u>before</u> calling the police. Indeed, they "would have [conducted the search] even if the police had not responded to [their] call." <u>Id.</u> Because the bounty hunters did not intend to assist law enforcement, they are not state actors under the second prong of <u>Souza</u>.[14]

_____

[14] Poe urges us to ignore <u>Souza</u> and apply the generic state action test established by <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922 (1982). In <u>Lugar</u>, a § 1983 action, the Supreme Court was faced with the question of whether a private actor could be held liable under the Due Process Clause. The Due Process Clause, like the Fourth Amendment, "can be violated only by conduct that may be fairly characterized as 'state action.'" <u>Id.</u> at 924. The Supreme Court held that to "fairly attribut[e]" the deprivation of a federal right to the state, the plaintiff must satisfy a two-part test: "First, the deprivation must be caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the State is responsible. . . . Second, the party

(continued...)

# III

Poe also challenges the sufficiency of the evidence as to each of the three counts. We review the sufficiency of the evidence de novo, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the jury's verdict. United States v. Wright, 506 F.3d 1293, 1297 (10th Cir. 2007). The evidence is insufficient to support a conviction only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. United States v. Castorena-Jaime, 285 F.3d 916, 933 (10th Cir. 2002). In our review, "we do not weigh conflicting evidence or consider witness credibility, as that duty is delegated exclusively to the jury." Id. (citing United States v. Sanders, 240 F.3d 1279, 1281 (10th Cir. 2001)). We conclude that sufficient evidence supported each conviction.

---

[14](...continued) charged with the deprivation must be a person who may fairly be said to be a state actor." Id. at 936.

This court adopted the test in Souza for use in the Fourth Amendment context after the Supreme Court decided Lugar, Pleasant, 876 F.2d at 797, and has continued to faithfully apply it. See, e.g., Souza, 223 F.3d at 1201; Smythe, 84 F.3d at 1242-43. We doubt that this panel could abandon this line of authority at this late date. Moreover, the second half of the Lugar test is precisely the question addressed by the Souza inquiry. Because we conclude that the bondsmen were not state actors, the Lugar test is not satisfied in any event. See Landry v. A-Able Bonding, Inc., 75 F.3d 200, 204 (5th Cir. 1996).

**A**

Count 2, the first count on which the jury convicted Poe, charged him with possession of a firearm and ammunition after a previous felony conviction, in violation of 18 U.S.C. § 922(g)(1). In order to obtain a conviction, the government had to prove that (1) Poe had a prior felony conviction, (2) he knowingly possessed the firearm and ammunition, and (3) the firearm traveled in or affected interstate commerce. United States v. Ledford, 443 F.3d 702, 705 (10th Cir. 2005). At trial, Poe stipulated to the first and third elements. On appeal, he disputes the sufficiency of the evidence as to the second element.[15]

Possession of a firearm can be either actual or constructive. United States v. Avery, 295 F.3d 1158, 1177 (10th Cir. 2002). An individual has constructive possession if he has "ownership, dominion, or control" over the firearm and the premises where the firearm is found. Ledford, 443 F.3d at 713. "In most cases, dominion, control, and knowledge may be inferred where a defendant has exclusive possession of the premises; however, 'joint occupancy alone cannot sustain such an inference.'" Id. (quoting United States v. Mills, 29 F.3d 545, 549 (10th Cir. 1994)). "In cases of joint occupancy, 'where the government seeks to prove constructive possession by circumstantial evidence, it must present

---

[15] Because the firearm's chamber and magazine were loaded, suggesting someone had loaded it in case it were needed for immediate use, there is no dispute that if Poe knowingly possessed the firearm, he also knowingly possessed the ammunition. We therefore limit our discussion to possession of the firearm.

- 19 -

evidence to show some connection or nexus between the defendant and the firearm or other contraband.'" Id. (quoting Mills, 29 F.3d at 549). This requires the government to point to evidence plausibly supporting the inference that the defendant had knowledge of and access to the firearm. Id. at 714.

The government advanced sufficient evidence to satisfy this inquiry. Although the firearm was found in Wilson's home and Poe no longer lived there, he testified that he had a key, kept clothes there, and regularly returned to shower, shave, change, and eat. For the purposes of establishing constructive possession, this is equivalent to joint occupancy. Cf. United States v. Goins, 437 F.3d 644, 649 (7th Cir. 2006). Poe's knowledge of the weapon was plainly established when, as noted, he stated to Officer Geery, "The dope and the gun are mine," and explained that he had obtained the gun in a drug trade. He had access to the firearm, as it was discovered in the room where police found him, on a shelf with the drugs and paraphernalia he was just using. Evidence of control of the premises, knowledge of the weapon, and access to it were sufficient to establish constructive possession. See Ledford, 443 F.3d at 714; United States v. Hien Van Tieu, 279 F.3d 917, 922 (10th Cir. 2002); Mills, 29 F.3d at 549-50.

Poe argues that this evidence was insufficient because it rests on his uncorroborated extrajudicial statement, "The dope and the gun are mine." See Smith v. United States, 348 U.S. 147, 152 (1954) (noting the general rule that an accused may not be convicted solely on the basis of his own uncorroborated

confession); United States v. Treas-Wilson, 3 F.3d 1406, 1408 (10th Cir. 1993) ("An uncorroborated extrajudicial confession is not sufficient to sustain a criminal conviction." (citation omitted)). Poe contends that this "corroboration rule" requires the government to point to independent evidence that he possessed the firearm. Because no one witnessed him physically possess the gun and no forensic evidence linked him to the gun, Poe argues that his statement was never corroborated and was thus insufficient to sustain his conviction.

Far from requiring the government to corroborate each detail of his statement, as Poe contends, the "corroboration rule" requires only that the government present evidence establishing the trustworthiness of the extrajudicial confession. It is sufficient for the government to show that the crime was committed in a manner consistent with the statement. See Treas-Wilson, 3 F.3d at 1409 ("The trustworthiness requirement . . . extends only to the corpus delicti, not the identity of the accused." (emphasis added; citation and footnote omitted)); United States v. Wiseman, 172 F.3d 1196, 1213 (10th Cir. 1999) ("When independent evidence shows that a crime was committed, no further corroboration is necessary; the identification of the defendant as the perpetrator may be based solely on his confession."). The testimony of the government's witnesses is consistent with Poe's statement that the gun was his. He not only claimed ownership, but also explained to police how he had acquired the gun. The gun was discovered in plain view in the same room as Poe, on a shelf with the drugs

- 21 -

and paraphernalia Poe admitted using. It was loaded, suggesting that someone had prepared it for immediate use. Furthermore, the gun was black, whereas Wilson—the other likely owner of the gun—told the bounty hunters about a silver gun. As all of this evidence is consistent with Poe possessing the gun, a reasonable jury could have found him guilty beyond a reasonable doubt.

**B**

On Count 3, the jury convicted Poe of possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). In order to uphold this conviction, we must decide whether a jury could have concluded beyond a reasonable doubt that Poe (1) knowingly possessed the methamphetamine and (2) did so with the intent to distribute it. United States v. Triana, 477 F.3d 1189, 1194 (10th Cir. 2007). Poe concedes there was sufficient evidence to support the jury's finding as to the first element but contests the sufficiency of the evidence as to the second element.

We conclude there was more than enough evidence to support the jury's conviction on this count. Even without more, "a jury may infer intent to distribute from the possession of large quantities of drugs," United States v. Pulido-Jacobo, 377 F.3d 1124, 1131 (10th Cir. 2004), and the Oklahoma City investigator testified that the quantity of methamphetamine was consistent with distribution. In addition, the jury could reasonably infer intent from the other evidence discovered at the scene: two sets of scales, individual Ziploc bags, a

loaded firearm, pit bulls, and surveillance equipment. The same investigator testified that drug dealers often use precisely the same type of equipment found at the house. And, Poe told Officer Geery that he planned to sell drugs to McGill and would have done so had there been more time. We therefore have no difficulty concluding that the jury's finding of intent to distribute was supported by sufficient evidence.[16]

### C

Count 4, the final count on which the jury convicted Poe, charged possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). To sustain the conviction, we must decide whether there was sufficient evidence (1) that Poe possessed the firearm and (2) that this possession was in furtherance of the drug trafficking crime. United States v. McCullough, 457 F.3d 1150, 1169-70 (10th Cir. 2006). Because Poe was convicted on sufficient evidence of possession of the firearm and of a drug trafficking crime, see 18 U.S.C. § 924(c)(2), we limit our discussion here to whether his possession was "in furtherance" of the drug trafficking crime.

In order to be sufficient to satisfy the "in furtherance" element, the government must show that "the weapon furthered, promoted or advanced a drug

---

[16] We agree with Poe that most of this evidence is also consistent with an alternative inference that Wilson distributed drugs. Yet, the mere existence of an alternative explanation does not require the finding of reasonable doubt. See United States v. Guanespen-Portillo, 514 F.3d 393, 397 (5th Cir. 2008).

- 23 -

trafficking crime." McCullough, 457 F.3d at 1169-70 (quotation omitted). This standard is satisfied if the firearm was kept available for use should it be needed during a drug transaction, and the defendant intended the firearm to be accessible for that purpose. United States v. Robinson, 435 F.3d 1244, 1251 (10th Cir. 2006) (citing United States v. Basham, 268 F.3d 1199, 1208 (10th Cir. 2001)). We consider a number of factors in making this determination including: (1) the type of drug activity conducted, (2) the accessibility of the firearm, (3) the type of firearm, (4) the legal status of the firearm, (5) whether the firearm was loaded, (6) the proximity of the firearm to drugs or drug profits, and (7) the time and circumstances under which the firearm was found. McCullough, 457 F.3d at 1170.

These factors support the jury's conviction. The gun was easily accessible to Poe and it was in plain view in the room where he was apprehended. Previously recited evidence is more than sufficient to support the inference that Poe intended the firearm to be accessible in case it was needed during a drug transaction. Thus the evidence was sufficient for the jury to convict of possession in furtherance of a drug trafficking crime. See Robinson, 435 F.3d at 1251.

**IV**

Poe challenges the procedural reasonableness of his ten-year term of supervised release, arguing that the district court miscalculated the applicable Guidelines range and imposed an upward departure without advance notice.

Poe's terms of supervised release run concurrently, and he challenges only the ten-year term imposed for his conviction on Count 3, possession of methamphetamine with intent to distribute.

Poe was sentenced on Count 3 under 21 U.S.C. § 841(b)(1)(C), which mandates a term of supervised release of "at least 6 years in addition to [the] term of imprisonment" imposed by the district court.[17]  Under the Guidelines, the term of supervised release applicable to Poe is "[a]t least three years but not more than five years for a defendant convicted of a Class A or B felony," U.S.S.G. § 5D1.2(a)(1), but "[t]he term of supervised release imposed shall be not less than any statutorily required term of supervised release," § 5D1.2(c).  At sentencing, the judge asked the parties what the "top end" of the <u>statutory</u> sentencing range was, but they did not have a specific answer.  The court did not inquire about, nor did the parties discuss, the relevant <u>Guidelines</u> range.  Ultimately, the district court imposed a ten-year term of supervised release, apparently concluding that the applicable Guidelines range was six years to life.  Poe did not object to the district court's analysis or to its imposition of the ten-year term of supervised release at the sentencing hearing.

---

[17] In relevant part, § 841(b)(1)(C) provides:  "Notwithstanding section 3583 of Title 18, any sentence imposing a term of imprisonment under this paragraph shall, in the absence of [a prior conviction for a felony drug offense], impose a term of supervised release of at least 3 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 6 years in addition to such term of imprisonment."

When a party fails to object contemporaneously to the district court's sentencing procedure, we review procedural reasonableness challenges for plain error. United States v. Mendoza, 543 F.3d 1186, 1190 (10th Cir. 2008). In order to prevail on plain error review, a party must show there is "(1) error, (2) that is plain, (3) which affects [the party's] substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Romero, 491 F.3d 1173, 1178 (10th Cir. 2007). Under this standard, we conclude that the district court did not commit plain error.

## A

Poe contends that six years was both the minimum and maximum term of supervised release under the Guidelines, and that the district court therefore committed procedural error by miscalculating the applicable Guidelines range. Because 21 U.S.C. § 841(b)(1)(C) mandates a supervised release term of "at least 6 years" in addition to any term of imprisonment, the ten-year term was within the relevant statutory range. Pertinently, the advisory Guidelines provide:

> (a) Except as provided in subsections (b) and (c), if a term of supervised release is ordered, the length of the term shall be:
>
> > (1) At least three years but not more than five years for a defendant convicted of a Class A or B felony.
> >
> > (2) At least two years but not more than three years for a defendant convicted of a Class C or D felony.
> >
> > (3) One year for a defendant convicted of a Class E felony or a Class A misdemeanor.

- 26 -

(b) Notwithstanding subdivisions (a)(1) through (3), the length of the term of supervised release shall be not less than the minimum term of years specified for the offense under subdivisions (a)(1) through (3) and may be up to life, if the offense is—

(1) any offense listed in 18 U.S.C. § 2332b(g)(5)(B), the commission of which resulted in, or created a foreseeable risk of, death or serious bodily injury to another person; or

(2) a sex offense.

(c) The term of supervised release imposed shall be not less than any statutorily required term of supervised release.

U.S.S.G. § 5D1.2.

Subsection 5D1.2(a) sets the Guidelines ranges for various felonies and misdemeanors that do not have statutory mandatory minimum terms of supervised release. Subsection 5D1.2(b) trumps § 5D1.2(a) when the defendant is convicted of an offense listed in 18 U.S.C. § 2332b(g)(5)(B) or a sex offense, and it explicitly provides that the Guidelines range shall be the minimum specified in § 5D1.2(a) and may extend to life. Finally, § 5D1.2(c) provides that any term of supervised release shall not be less than the statutory mandatory minimum.

Poe contends that § 5D1.2(a) interacts with § 5D1.2(c) such that if a statutory mandatory minimum is higher than the term a defendant would otherwise receive under § 5D1.2(a), that statutory minimum is also the maximum of the applicable Guidelines range. Under this theory, the applicable Guidelines

range in this case is six years, no more, no less.[18]  The government argues that when the statutory mandatory minimum is higher than the range under § 5D1.2(a), § 5D1.2(c) is the only applicable subsection, and the Guidelines range is equivalent to the statutory range.  Under this theory, the applicable Guidelines range is six years to life.

We need not decide whether the district court erred by miscalculating the Guidelines range because any error was not <u>plain</u>.  Error is plain only if it is "clear or obvious under current law."  <u>United States v. Kelly</u>, 535 F.3d 1229, 1238 (10th Cir. 2008) (quotation omitted).  "An error is clear and obvious when it is contrary to well-settled law."  <u>United States v. Ruiz-Gea</u>, 340 F.3d 1181, 1187 (10th Cir. 2003) (quotation omitted).  "The absence of . . . precedent [on point] will not, however, prevent a finding of plain error if the district court's interpretation was 'clearly erroneous.'"  <u>Id.</u> (citing <u>United States v. Brown</u>, 316 F.3d 1151, 1158 (10th Cir. 2003)).  Poe has pointed to no Supreme Court or Tenth Circuit decisions directly addressing the Guidelines issue he raises, nor do we know of any.  Because the Guidelines are not "clearly and obviously . . . limited"

---

[18] The probation officer who prepared Poe's PSR apparently proceeded under this theory.  Poe's PSR states:  "Count 3: The advisory guideline range for a term of supervised release is 6 years in accordance with the minimum required by statute pursuant to USSG § 5D1.2(c)."  At the sentencing hearing, the officer stated that she had not "seen a Court do more than six years when it says no less than six years on this type of case."

- 28 -

to the interpretation Poe advocates, the district court's interpretation was not clearly erroneous.  See Brown, 316 F.3d at 1158.

**B**

Poe also claims error because he did not receive notice that the district court was contemplating a departure from the Guidelines range for his supervised release sentence on Count 3.  See Fed. R. Crim. P. 32(h) (requiring advance notice for departures).  However, the district court patently did not depart from the advisory Guidelines range in the case.  Rather, Poe was sentenced to a term of supervised release within the Guidelines range as calculated by the district court, a calculation we uphold under our plain error standard of review.  Accordingly, the sentencing court was not required to give advance notice.  See Irizarry v. United States, 128 S. Ct. 2198, 2202 (2008).

**V**

Finally, Poe argues that the district court erred when it applied a two-level increase to his offense level for obstruction of justice.  Applying de novo review to the district court's legal interpretation of the Guidelines and clear error review to its factual findings supporting the application of the enhancement, we conclude that the district court did not err.  See United States v. Mares, 441 F.3d 1152, 1159-60 (10th Cir. 2006).

The district court found that Poe perjured himself at trial and applied a two-level obstruction of justice enhancement on that basis.  Under U.S.S.G. § 3C1.1:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

Perjury supports such an enhancement.  § 3C1.1, cmt. n.4(b); <u>Mares</u>, 441 F.3d at 1161.

In order to establish that Poe committed perjury, the district court had to conclude that Poe (1) gave false testimony under oath, (2) about a material matter, and (3) the false testimony was willful and not the result of confusion, mistake or faulty memory.  <u>Mares</u>, 441 F.3d at 1161 n.4.  The district court concluded that Poe perjured himself when he testified that he did not possess the firearm and did not intend to distribute methamphetamine on August 3.[19]

The district court's conclusion is justified because, in reaching its verdicts, the jury necessarily concluded that Poe testified falsely under oath with respect to both of these matters.   As discussed above, both possession of the gun and intent to distribute the methamphetamine were material to his convictions.  Finally,

---

[19] At trial, Poe testified as follows:

> Q: Did you possess with intent to distribute methamphetamine on August 3rd?
> A: No, I did not.  As I stated before, I was getting high.
> Q: Did you possess that firearm August 3, 2006?
> A: No, I did not.

given the direct nature of the questions asked, it was not clearly erroneous for the district court to conclude that Poe's false testimony was willful. Accordingly, we affirm the district court's application of the § 3C1.1 obstruction of justice enhancement.

## VI

**AFFIRMED**.