**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 5, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

FRANCISCO JAVIER PALILLERO,

    Defendant - Appellant.

No. 19-2111
(D.C. No. 2:18-CR-02311-KG-1)
(D. New Mexico)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **BALDOCK**, and **McHUGH**, Circuit Judges.
_____

A jury convicted Francisco Javier Palillero of sexual abuse, and the district

court sentenced him to 121 months' imprisonment. This is Mr. Palillero's direct

appeal from his conviction and sentence. He raises four arguments: (1) insufficient

evidence; (2) improper exclusion of a defense expert; (3) imposition of a

substantively unreasonable sentence; and (4) cumulative error. We affirm.

The evidence at trial was sufficient for a reasonable jury to find Mr. Palillero

guilty of sexual abuse. The district court did not abuse its discretion when it excluded

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

the testimony of Mr. Palillero's DNA expert as a sanction for late and inadequate disclosure. The district court's sentence was not unreasonable. And, because Mr. Palillero has not shown error, he cannot prevail on his claim of cumulative error.

## I.   BACKGROUND

### A.   *Factual History*

We review "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the jury's verdict." *United States v. Poe*, 556 F.3d 1113, 1124 (10th Cir. 2009).

### 1.  Criminal Conduct

On April 27, 2018, Ashley Napier[1] and her fiancé, Adam Pratschler, attended a backyard barbeque on Holloman Air Force Base hosted by their neighbors, Shante and Francisco Palillero. Ms. Napier and Mr. Pratschler had attended prior social events at the Palilleros' house; Ms. Napier considered them "friends." App., Vol. IV at 201. Yet, Ms. Napier had never spent any time alone with Mr. Palillero. Another neighbor, Lieutenant Douglas Cole, also attended the barbeque.[2]

Around 10:00 p.m., Ms. Napier walked home with Mr. Pratschler. Ms. Napier took her two dogs to bed with her and closed the bedroom door. She then fell asleep sometime before 11:00 p.m. Mr. Pratschler returned to the barbeque.

---

[1] Ashley Napier is now Ashley Pratschler. We refer to her using her last name at the time of the events in question: Napier.

[2] Lieutenant Cole arrived late and noticed that many of the people in attendance were intoxicated, including Mr. Palillero and Mr. Pratschler.

Sometime later, Lieutenant Cole walked Mr. Pratschler home. Mr. Palillero accompanied them. Lieutenant Cole and Mr. Pratschler talked in the living room for thirty or forty-five minutes, with Mr. Palillero occasionally walking in and out of the room.

At approximately 2:16 a.m., Ms. Napier was awakened by her dogs rustling on the bed. She perceived light coming through the bedroom door and could hear Mr. Pratschler, who "sounded upset." App., Vol. IV at 218. Ms. Napier then texted Mr. Pratschler to "[g]o to sleep" and fell back asleep. App., Vol. IV at 218.

Next, Ms. Napier "was woken up to someone's hands all over [her], fast and hard, rubbing all over [her] body, like [her] breasts, into [her] underwear, sliding them around." App., Vol. IV at 218. The assailant's tongue touched her lips, face, and teeth. And, the assailant touched Ms. Napier's clitoris with a fingernail, causing pain. Lastly, the assailant tried to push his finger inside Ms. Napier's vagina.

Ms. Napier recognized the assailant as Mr. Palillero and pushed him off. Mr. Palillero "scurried out of the room back into the hallway, and then came back in and said, 'Don't say anything. Don't say anything.'" App., Vol. IV at 220. Ms. Napier then texted Mr. Pratschler, "Francisco was just in here trying to finger me as I slept." App., Vol. IV at 220.

Meanwhile, Lieutenant Cole witnessed Mr. Pratschler exit the bathroom holding his phone, "very shaken up." App., Vol. V at 42. Mr. Pratschler asked Mr. Palillero, "Did you touch my wife?" App., Vol. V at 42. Mr. Pratschler then asked Lieutenant Cole to read the text message because he was "the only one sober." App.,

3

Vol. V at 42. Lieutenant Cole read the text message and then asked Mr. Palillero whether he had touched Ms. Napier. Mr. Palillero answered no but "wasn't making eye contact." App., Vol. V at 42. Lieutenant Cole repeated the question, and Mr. Palillero again answered no.

At that point, Ms. Napier put on a pair of pants and exited the bedroom. Seeing Mr. Palillero "leaning up against the door at the end of the hallway," she punched him in the face, screaming, "You were touching me when I slept." App., Vol. IV at 222. Ms. Napier shoved Mr. Palillero and he fell. Lieutenant Cole separated Ms. Napier and Mr. Palillero. At some point, Mr. Palillero left the house.

Lieutenant Cole asked Ms. Napier if she wanted him to call the security forces at Holloman Air Force Base. When Ms. Napier responded yes,[3] Lieutenant Cole exited the house and called the security forces.

## 2. The Investigation

Holloman Air Force Base Security Forces responded to the scene. According to the Security Forces report, Ms. Napier was "shocked" and "traumatized" during her discussion with the security forces officers, and could not recall her own address. App., Vol. IV at 225.[4] In a written statement that Ms. Napier provided to Officer

---

[3] At trial, Lieutenant Cole suggested that he made the decision to call the security forces. Whether Lieutenant Cole or Ms. Napier made the ultimate decision to call the security forces is immaterial.

[4] Sergeant Justin Goad spoke with Ms. Napier and did not notice any indicia of intoxication.

Shamelia Nicholson, Ms. Napier recalled Mr. Palillero entering the bedroom and attempting to touch her three times while she was sleeping, like "a bad dream." App., Vol. IV at 227.[5]

Later, members of the Holloman Air Force Base Office of Special Investigations ("OSI") arrived. OSI Special Agent Leslie Keopka[6] interviewed Ms. Napier for approximately twenty-five minutes.

Agent Keopka then called Federal Bureau of Investigation Special Agent Karen Ryndak. Agent Ryndak and Supervisor Special Agent Amy Willeke traveled the approximately one-hour drive to Holloman Air Force Base. While Ms. Napier was waiting for the FBI agents to arrive, she repeatedly touched her face while adjusting her glasses, resting her hand on her face, and rubbing her neck. Agents Willeke and Ryndak then interviewed Ms. Napier, who was "visibly shaken," "upset," "embarrassed," and "angry." App., Vol. IV at 149, 189. During the interview, neither Agent Willeke nor Agent Ryndak "notice[d] any signs of intoxication on [Ms. Napier]." App., Vol. IV at 149, 190.

---

[5] At trial, Ms. Napier clarified that she had not actually seen Mr. Palillero exit the bedroom and return. Rather, her written statement recounted three separate "glimpses" of him touching her before she opened her eyes. App., Vol. IV at 234.

[6] Leslie Keopka is now Leslie Franz. As with Ms. Napier, we refer to Agent Keopka using her last name at the time of the events in question.

After the interview, the FBI agents drove Ms. Napier back to her house, where they dusted for fingerprints. The fingerprints the agents collected were smudged, and consequently not suitable for analysis.

The agents also obtained consent to search Ms. Napier's cell phone. Mr. Palillero was not listed in Ms. Napier's contacts, and there were no text messages between Mr. Palillero and Ms. Napier.

Around 11:45 a.m., the FBI agents sent Ms. Napier to a clinic for a Sexual Assault Nurse Exam ("SANE"). One standard step in a SANE is collection of DNA. Michelle Wood, a nurse, swabbed Ms. Napier's face, lips, teeth, fingers, nails, knuckles, left arm, left hip, mons pubis, and labia majora. Nurse Wood also collected Ms. Napier's underwear.[7]

Ms. Napier told Nurse Wood that after the assault she had inserted a tampon, thrown up, smoked, and drank.[8] App., Vol. V at 136. Ms. Napier also specifically told Nurse Wood that Mr. Palillero had attempted "digital penetration." App., Vol. V at 137.

Later that day, FBI agents arrested Mr. Palillero. During the drive to jail, Mr. Palillero asked for a drink of water. The agents provided Mr. Palillero with water

---

[7] As part of the SANE, Ms. Napier filled out a questionnaire. At trial, Ms. Napier acknowledged that several of her responses on that questionnaire were not accurate. For example, Ms. Napier answered that she had not brushed her teeth prior to the SANE when, in fact, she had brushed her teeth.

[8] It is not clear from the trial transcript what liquid Ms. Napier drank.

from a water bottle and collected the bottle for a DNA sample. Agent Ryndak later collected an additional sample of Mr. Palillero's DNA using a swab. Although Ms. Napier was menstruating on April 27, Agent Willeke did not recall seeing any blood on Mr. Palillero's hands during her investigation.

At some point, Mr. Palillero called his wife from jail and stated that he "was in [Ms. Napier's] bedroom" and "went in her room to wake her up." App., Vol. IV at 157, 184.

### 3. DNA Expert Testimony

At trial, the United States presented expert testimony from Jerrilyn Conway, an FBI forensic examiner. Ms. Conway explained that "DNA transfer can occur anytime someone comes in contact with an item." App., Vol. V at 162. "Another way is through skin cells or contact," with various factors influencing the amount of the transfer. App., Vol. V at 162. Two of those factors are post-transfer contact—for example, handwashing, teeth brushing, or vomiting—and the passage of time.

Ms. Conway reviewed each DNA sample that was submitted to her laboratory and testified as follows:

- No DNA other than Ms. Napier's was found in the mons pubis, labia majora, cheek, hip, arm, or mouth samples.

- The finger and knuckle samples contained a mixture of male and female DNA. Ms. Conway excluded Mr. Palillero as a contributor.

- A sample taken from the outside of Ms. Napier's underwear contained a mixture of DNA. Ms. Conway was unable to exclude Mr. Palillero as a contributor. She testified that the amount of DNA present in the sample was so low it could have been the result of "going through the washing machine." App., Vol. V at 173.

7

- A sample taken from the inside of Ms. Napier's underwear contained a mixture of male and female DNA. Ms. Conway excluded Mr. Palillero as a contributor.

Ms. Conway explained that these "inconclusive" results do not "tell us anything either way" about Mr. Palillero's guilt. App., Vol. V at 175. Ms. Conway further opined that she was not surprised at her inability to identify Mr. Palillero's DNA in any of the samples, given the events that transpired in the ten hours between the assault and collection of the samples.

## B.  *Procedural History*

On July 18, 2018, a grand jury in the District of New Mexico indicted Mr. Palillero on one count of knowingly engaging in a sexual act with a person incapable of appraising the nature of the conduct or physically incapable of declining, within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. §§ 2242(2)(A) and (B) and 2246(2)(C).

On November 7, 2018, the United States filed its witness list; this witness list included Ms. Conway, the FBI forensic examiner. On November 19, five days after the district court's deadline for disclosure of experts, the United States gave notice of its intent to introduce DNA expert testimony via Ms. Conway. In response, Mr. Palillero moved to exclude the United States' DNA expert or, in the alternative, to delay the trial.

At the pretrial conference on November 30, the United States explained that it had been unable to provide notice of its intent to call a DNA expert before the district court's deadline because it did not receive one of Ms. Conway's DNA reports until

8

November 16. In addition, the United States argued there was no prejudice because it had included Ms. Conway on the November 7 witness list and had disclosed her first DNA report to defense counsel on October 29. The district court determined that the United States' late filing was "excused" and permitted Ms. Conway to testify as a DNA expert. Appellee App. at 64.

On December 2, the day before trial, Mr. Palillero noticed his intent to introduce expert testimony from Dr. Michael J. Spence to rebut the United States' DNA expert. That notice "anticipate[d] that [Dr.] Spence will provide rebuttal testimony regarding FBI policies and procedure relating to serological and DNA examination and their application to the examination in this case." Appellee App. at 36. The notice further "anticipated that [Dr.] Spence will testify in rebuttal to the methods of DNA analysis including Y short tandem repeat and autosomal genotyping in addition to rebuttal testimony about the transfer of DNA, including by touch." Appellee App. at 37.

At the start of trial on December 3, the United States asked that Dr. Spence's testimony be excluded because Mr. Palillero's notice did not include a meaningful summary. The district court asked defense counsel to clarify and he responded:

> Well, Your Honor, he's going to say that it is possible -- I mean, that it's -- that it's really not possible for all of this touching and kissing and licking and so on to go on without transferring DNA, Your Honor. But we're anticipating that the Government's expert is going to testify that it's possible to touch someone and kiss them and do all these other things and not transfer DNA, Your Honor. He's going to testify to just the opposite.

App., Vol. IV at 255–56.

9

The district court then asked defense counsel what efforts he had made to secure expert testimony prior to trial, and defense counsel responded:

> Your Honor, we contacted the New Mexico Criminal Defense Lawyers Association, we also called some other people that we know, and we did search for some other individuals, Your Honor.
>
> Your Honor, so I -- some of my clients are doctors. We talked to them. We contacted the New Mexico Criminal Defense Lawyers Association. Beyond that, I'm not sure what else my staff may have done, but that's -- that was the crux of it, Your Honor.

App., Vol. IV at 257–58.

The district court ruled that Dr. Spence would not be permitted to testify because defense counsel's notice was neither timely nor detailed enough to give the United States a chance to prepare. The district court also found that Mr. Palillero would not be prejudiced by the inability to rebut the United States' DNA expert testimony because that testimony was exculpatory.

On December 4, after the prosecution rested, Mr. Palillero filed a renewed notice that he intended to introduce Dr. Spence's testimony. The renewed notice parroted the first notice in all relevant respects. Attached to the renewed notice was Dr. Spence's summary of his findings; namely, that DNA evidence provided "no scientific support for the allegations associated with this case investigation." Appellee App. at 47.

The United States objected on the grounds that the renewed notice was not timely and that it was cumulative of Ms. Conway's testimony. The district court

10

asked defense counsel what would be "new" about Dr. Spence's testimony. App.,

Vol. V at 208. Defense counsel replied:

> Well, Your Honor, let me take a look here to see. Your Honor, I think he would definitely testify to some peer-review articles. That's definitely new. Those haven't been heard.
>
> Let me see what else. So I know he has a peer-reviewed article that he wanted to discuss. And I'm trying to see what else he said here, Judge.

App., Vol. V at 208.

After the district court pointed out that defense counsel's renewed notice did not mention any peer-reviewed articles, defense counsel stated, "I don't know what all he's going to testify to." App., Vol. V at 210. And in response to more prodding from the district court, defense counsel replied, "I do think there would be something new, Your Honor, but I can't tell you what that is." App., Vol. V at 211.

The district court refused to permit Dr. Spence's testimony on the basis that it would be cumulative of Ms. Conway's testimony. The district court also found that Mr. Palillero was not prejudiced because defense counsel had the opportunity to cross-examine Ms. Conway.

In addition to Ms. Conway, the prosecution called Ms. Napier, Lieutenant Cole, and others to testify. Defense counsel did not call any witnesses. The jury found Mr. Palillero guilty of sexual abuse.

The United States Probation Office then prepared a Presentence Investigation Report ("PSR"). The PSR calculated a base offense level of 30, with a two-level enhancement because Mr. Palillero knew or should have known the victim was

11

vulnerable. The resulting total offense level of 32, combined with a criminal history category of I, yielded a United States Sentencing Guidelines ("Guidelines") imprisonment range of 121 to 151 months.

On July 2, 2019, the district court sentenced Mr. Palillero to a 121-month term of imprisonment, to be followed by a 5-year term of supervised release. With respect to Mr. Palillero's conduct, the district court stated:

> I am convinced that you went down that hall and went into that bedroom with intentions to do more than just digitally touch. You went in there with the intentions to do much more, and it was only because -- it was only because she woke up that it didn't go further.

App., Vol. VI at 107.

Mr. Palillero timely filed a notice of appeal.

## II. DISCUSSION

Mr. Palillero asserts four grounds for reversal: (1) that the prosecution presented insufficient evidence; (2) that the district court improperly excluded defense expert testimony; (3) that the district court's chosen sentence was substantively unreasonable; and (4) that the district court committed cumulative error. We address each of these contentions in turn.

### A. *Whether the Prosecution Presented Sufficient Evidence of Sexual Abuse*

"We review the sufficiency of the evidence de novo." *Poe*, 556 F.3d at 1124. "The evidence is insufficient to support a conviction only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* at 1124–25. "In our review, we do not weigh conflicting evidence or consider witness credibility, as that

12

duty is delegated exclusively to the jury." *Id.* at 1125 (internal quotation marks omitted).

The jury found Mr. Palillero guilty of violating 18 U.S.C. §§ 2242(2)(A) and (B) and 2246(2)(C). To find Mr. Palillero guilty, the jury needed to find that he "knowingly . . . engage[d] in a sexual act" with Ms. Napier while she was "incapable of appraising the nature of the conduct," or "physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act." *Id.* § 2242. Mr. Palillero does not contest he knew Ms. Napier was asleep, so we focus our analysis solely on the sexual act element of the offense.

The sexual act charged in the indictment was "the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." *Id.* § 2246(2)(C). A reasonable jury could have found beyond a reasonable doubt that Mr. Palillero knowingly engaged in a sexual act.

First, a reasonable jury could credit Ms. Napier's testimony that Mr. Palillero entered her bedroom and attempted to or did insert his finger into her vagina. Within seconds of the assault, Ms. Napier identified Mr. Palillero in her text message to Mr. Pratschler. And in multiple interviews with various law enforcement officers over the course of the subsequent twelve hours, Ms. Napier's story remained consistent in all material respects.

Second, a reasonable jury could credit Lieutenant Cole's testimony that Mr. Palillero was present in Ms. Napier's house at the time in question, occasionally

13

walking in and out of the living room. A reasonable jury could also credit Lieutenant Cole's impression of Mr. Palillero's reaction when initially confronted with Ms. Napier's text message: namely, that he "wasn't making eye contact." App., Vol. V at 42.

Third, a reasonable jury could partially disbelieve the statements Mr. Palillero made to Ms. Palillero from jail. To reiterate, Mr. Palillero stated that he "was in [Ms. Napier's] bedroom" and "went in her room to wake her up." App., Vol. IV at 157, 184. A reasonable jury could accept that Mr. Palillero was in Ms. Napier's bedroom but was not there to wake her up. None of the trial testimony suggests any reason why Mr. Palillero might have needed to awaken Ms. Napier. And if there were some emergency that required such an unusual step, Lieutenant Cole would presumably have been aware of it. Further, Mr. Palillero would have had ample incentive to misrepresent to his wife what his actual conduct and intentions were when he went into Ms. Napier's bedroom.

Mr. Palillero's counterarguments all rest on the idea that the prosecution overlooked one or more dogs that did not bark (both figuratively and literally). That is, he relies on the absence of certain evidence. The overarching problem with these arguments is that, for them to create reasonable doubt, there must be some evidentiary support for the notion that we would *ordinarily expect* such things to happen under similar circumstances. And here that support is missing, in large part because Mr. Palillero did not call a single witness to the stand in his defense. With that in mind, we now review each of Mr. Palillero's specific arguments.

14

Mr. Palillero first argues that if Ms. Napier were telling the truth, there would have been DNA recovered from various parts of her person and clothing. To the contrary, Ms. Conway testified she was not surprised at her inability to identify Mr. Palillero's DNA in any of the samples due to the time that had passed and the actions taken between the attack and the recovery of the samples. Mr. Palillero's argument rests on the idea that the absence of DNA would support reasonable doubt. But no trial testimony, scientific or otherwise, supports that broad assertion. And even if such evidence had been presented, the jury was free to credit Ms. Conway's contrary testimony.

Next, Mr. Palillero posits that—because Ms. Napier was menstruating on the night in question—investigators should have found blood on Mr. Palillero's hands. First, no trial testimony, scientific or otherwise, supports the notion that any contact between a finger and a vagina during menstruation necessarily results in the transfer of residual blood to that finger. Second, Mr. Palillero went home before investigators arrived at the scene, leaving him time to wash his hands or otherwise wipe off traces of evidence. Third, Ms. Napier testified she was wearing a tampon at the time of the attack.

Mr. Palillero also contends investigators should have taken DNA samples from his fingers or hands the night of the assault. Perhaps, but our task when reviewing the sufficiency of the evidence is to evaluate the evidence presented to the jury. We are not reviewing the thoroughness of the investigation, a topic that defense counsel could have explored during cross-examination but chose not to.

15

Mr. Palillero further asserts that—"[i]n light of [Ms. Napier's] knowledge of martial arts"—there should have been "signs of an assault" on Mr. Palillero's hands or face. Appellant Br. at 37. To the extent Mr. Palillero is suggesting he must not have assaulted Ms. Napier because she did not physically injure him as she woke from her slumber, a reasonable jury could reject that argument. No trial testimony supports the notion that a person trained in martial arts who awakens during a sexual assault usually (or even generally) inflicts physical injury on the assailant. Further, Ms. Napier did react physically once she was fully awake.

Mr. Palillero next argues Ms. Napier's written statement contradicts her testimony at trial, because in that statement, she described Mr. Palillero entering the bedroom and attempting to touch her three times. At trial, Ms. Napier clarified her written statement, testifying that she glimpsed Mr. Palillero several times before she fully opened her eyes. A reasonable jury could credit Ms. Napier's clarification and conclude that Mr. Palillero entered the bedroom once prior to the assault.

Mr. Palillero also contends it is implausible that Ms. Napier responded to sexual assault by immediately texting Mr. Pratschler. That misstates the record, somewhat. In fact, Ms. Napier responded by pushing Mr. Palillero away. Then, Mr. Palillero left her bedroom, returned, told her not to say anything, and left again. Only then did Ms. Napier text Mr. Pratschler.

Mr. Palillero similarly asserts that it "strains credulity" that Ms. Napier did not "fight back or scream or yell." Appellant Br. at 38. First, no testimony supports the notion that victims of sexual assault—particularly those assaulted while sleeping—

16

typically do any of those things. So, the absence of those responses from Ms. Napier does not supply reasonable doubt. Second, Ms. Napier did fight back. She got up, put pants on, left the bedroom, and punched Mr. Palillero in the face.

Lastly, Mr. Palillero argues that one or both of Ms. Napier's dogs should have barked during the assault. At trial, Ms. Napier testified that when Mr. Palillero entered her bedroom, the dogs rustled around on the bed and briefly woke her. Otherwise, no trial testimony addresses the question of how Ms. Napier's dogs typically react or do not react to movement in the bedroom.

In sum, a reasonable jury could conclude, beyond a reasonable doubt, that Mr. Palillero knowingly engaged in a sexual act when he inserted his finger into Ms. Napier's vagina while she was sleeping. Mr. Palillero's sufficiency of the evidence challenge fails.

**B.** *Whether the District Court Erred when it Excluded the Defense's DNA Expert*

The district court excluded Dr. Spence's testimony because Mr. Palillero's two notices of intent to introduce that testimony were late and non-specific. "We review the exclusion of expert testimony for abuse of discretion." *United States v. Paup*, 933 F.3d 1226, 1230 (10th Cir. 2019). We uphold the district court's decision to exclude Dr. Spence's testimony due to its untimely disclosure and inadequacy.

**1. Discovery Violation**

Rule 16 of the Federal Rules of Criminal Procedure states that, if the United States discloses a written summary of expert testimony, "[t]he defendant must, at the government's request, give to the government a written summary of any testimony

17

that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial." Fed. R. Crim. P. 16(b)(1)(C). In other words, the defendant must disclose a written summary of expert testimony. "This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id.*

There is no doubt that Mr. Palillero failed to comply with Rule 16. The district court set a deadline of November 14 for the disclosure of written summaries. Yet Mr. Palillero did not file his first notice of intent to introduce expert testimony until December 2, the day before trial. In addition, defense counsel provided only a vague statement of the expected testimony that lacked the bases and reasons for Mr. Spence's opinions and his qualifications.

Mr. Palillero responds that his late disclosure was justified by the United States' late disclosure. It is true that the United States filed its written summary five days late. But Mr. Palillero does not cite anything in our cases suggesting that a short delay by one party excuses a much longer delay by the other party. *Cf. United States v. Bishop*, 926 F.3d 621, 628 (10th Cir. 2019) ("[O]ne party's failure to comply with the Rules does not alter the other party's obligation to follow the Rules"). And while the United States' disclosure was late, that disclosure was complete and provided well before the scheduled trial date. Accordingly, the district court did not err in concluding that Mr. Palillero failed to comply with Rule 16.

2. **Sanction**

Rule 16 also addresses the question of remedy. It states:

18

> If a party fails to comply with this rule, the court may:
>> (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
>> (B) grant a continuance;
>> (C) prohibit that party from introducing the undisclosed evidence; or
>> (D) enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2).

We have instructed district courts to consider three factors when contemplating a discovery sanction in a criminal case: "(1) the reason for the delay in disclosing the witness; (2) whether the delay prejudiced the other party; and (3) the feasibility of curing any prejudice with a continuance." *United States v. Adams*, 271 F.3d 1236, 1244 (10th Cir. 2001). "These factors do not dictate the bounds of the court's discretion, but merely guide the district court in its consideration of sanctions." *Paup*, 933 F.3d at 1232 (internal quotation marks omitted).

    a. *The reason for the delay*

At the start of trial, the district court asked defense counsel what efforts he had made to secure expert testimony in a timely manner. Defense counsel replied that he had "contacted the New Mexico Criminal Defense Lawyers Association" and others. App., Vol. IV at 257–58. But defense counsel did not contact Dr. Spence until the eve of trial and even then, did not know what the substance of his testimony would entail.

Defense counsel's explanation for the delay was wholly inadequate. Defense counsel should have known from the start that DNA would play a role in this case,

19

given that he was present when detectives swabbed Mr. Palillero. In addition, defense counsel received Ms. Conway's lab report on October 29, which should have put him on notice of the significance of the DNA evidence. At the very latest, defense counsel should have known on November 7, when the United States disclosed its witness list, that it intended to call Ms. Conway to testify as to that report.

This court has previously held defense counsel accountable for comparable delay. In *Adams*, for example, we upheld the district court's exclusion of the defendant's expert witness, reasoning

> that three months had passed since the defendant's indictment, that defense counsel knew or should have known of defendant's claim that he lied to the police in order to protect his girlfriend, and that concerns about the defendant's mental state and ability had been raised by the defendant's grandmother both prior to and at the plea hearing.

271 F.3d at 1244.

Here, the nurse collected evidence to be processed for DNA on the night of the attack and, as of September 21, defense counsel was provided with the results of those tests. To the extent defense counsel hoped to argue those results were exculpatory, he should have initiated his search for a DNA expert immediately. Instead, defense counsel waited until December 2, the day before trial, to name Dr. Spence as an expert and then did so without any understanding of the details of the anticipated testimony.

b. *Prejudice*

The district court found that Mr. Palillero's inadequate and late notice prejudiced the United States by denying it the chance to prepare for Dr. Spence's

20

testimony. We agree. In *Adams*, we held that a notice filed three days before trial prejudiced the United States. *Id.* It follows that a notice filed the day before trial likewise creates prejudice.

Mr. Palillero argues that he was prejudiced by the exclusion of Dr. Spence's testimony. But that turns the inquiry on its head. Our analysis asks whether the failure to comply with the expert disclosure deadlines prejudiced the other party, not whether exclusion of the expert would harm the violator. Here, the prejudicial effect of the discovery violation is apparent. The United States had no opportunity to prepare for the cross examination of Dr. Spence.

Regardless, "even in the absence of prejudice, a district court may suppress evidence that did not comply with discovery orders to maintain the integrity and schedule of the court." *Id.* (internal quotation marks omitted). If we were to require the district court to allow Dr. Spence's testimony where it was neither timely nor properly summarized, it could undermine the integrity of the judicial proceeding by encouraging gamesmanship.

c. *The feasibility of a continuance*

Next we consider the feasibility of granting a continuance.[9] This factor further supports the district court's decision. The Air Force transported Lieutenant Cole from

---

[9] Although the district court did not expressly address the feasibility of a continuance, our precedents do not require that it do so. In *United States v. Adams*, for example, the district court failed to address this factor but we nevertheless affirmed its decision to exclude expert testimony. 271 F.3d 1236, 1244 (10th Cir. 2001).

Japan to New Mexico so he could testify at trial. A continuance on the eve of trial would have required that Lieutenant Cole make an extra trip across the Pacific at some future date. As a result, a continuance was not feasible.

In summary, defense counsel failed to present a reasonable justification for the failure to adequately and timely comply with the disclosure of the defense's DNA expert. The failure prejudiced the United States, and that prejudice could not have been feasibly avoided by a continuance. Accordingly, we affirm the district court's exclusion of Dr. Spence's testimony.

### C. *Whether Mr. Palillero's Sentence is Substantively Unreasonable*

### 1. Standard of Review

"This court reviews a district court's decision to grant or deny a request for variance under a deferential abuse of discretion standard." *United States v. Beltran*, 571 F.3d 1013, 1018 (10th Cir. 2009). "A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *Id.* (internal quotation marks omitted). "When the district court's sentence falls within the properly calculated [G]uideline[s] range, this Court must apply a rebuttable presumption that the sentence is reasonable." *Id.* "The presumption of reasonableness is, however, a deferential standard the defendant may rebut by demonstrating that the sentence is unreasonable when viewed against the other factors delineated in [18 U.S.C.] § 3553(a)." *Id.* (internal quotation marks omitted). One of those factors is "the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

## 2. Analysis

Mr. Palillero argues the district court's sentence was unreasonable because his offense conduct was less severe than most offense conduct punishable under the same statute, as well as for the related reason that the cases cited by the prosecution and relied on by the district court involved more serious sexual abuse than what occurred in this case. Mr. Palillero fails, via these arguments, to rebut the presumption of reasonableness that we attach to his within-Guidelines sentence.

The district court imposed a sentence of 121 months' imprisonment, at the low end of the applicable Guidelines range. The district court agreed with the Guidelines calculations in the PSR and considered the § 3553 factors in imposing sentence. In addition, the district court noted, that to the extent Mr. Palillero's assault was less serious than some other instances of sexual abuse, that was only because Ms. Napier woke up and pushed him away. Under these circumstances, the district court did not abuse its discretion in denying Mr. Palillero's request for a variance. *See United States v. Lente*, 759 F.3d 1149, 1168 (10th Cir. 2014) (explaining that even "disparate sentences are allowed where the disparity is explicable by the facts on the record" (quotation marks omitted)).

Mr. Palillero also contends 121 months' imprisonment is unreasonably long because "there was no force or intercourse." Appellant Br. at 51. By intercourse Mr. Palillero appears to mean penetration with a penis. But that is not Congress's

23

definition of a sexual act, which includes digital penetration of another person's genital orifices. *See* 18 U.S.C. § 2246(2)(C). It was Mr. Palillero's nonconsensual commission of a sexual act, as defined by Congress, that in turn determined his applicable Guidelines range of 121 to 151 months' imprisonment.

Finally, Mr. Palillero argues that other sexual abuse cases resulting in comparable or longer sentences involved more serious sexual abuse than what occurred in this case. Though some of the cited cases involved observable physical injuries, here Mr. Palillero inflicted pain on Ms. Napier by rubbing his fingernail on her clitoris. Mr. Palillero's argument also assumes the only relevant injuries are physical injuries. At the sentencing hearing, Ms. Napier testified about the long-term emotional harm she has suffered as a result of Mr. Palillero's assault. In light of these considerations, the district court's chosen sentence was neither unreasonable nor arbitrary.

### D. *Whether the District Court Committed Cumulative Error*

#### 1. Legal Standard

"We consider cumulative error only if the appellant has shown at least two errors that were harmless." *United States v. Christy*, 916 F.3d 814, 827 (10th Cir. 2019). "Anything less would leave nothing to cumulate." *Id.* "The question is whether the two or more harmless errors together constitute prejudicial error." *Id.*

#### 2. Analysis

Mr. Palillero's opening brief spends approximately three pages on cumulative error, in which he asserts seven errors allegedly made by the district court. The first

24

four asserted errors are merely different versions of the argument that it was an abuse of discretion to exclude Dr. Spence's testimony (discussed above). The other three asserted errors are each raised in a single sentence, and we do not consider them. *United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) ("[A]rguments may be deemed waived when they are advanced in an opening brief only in a perfunctory manner." (internal quotation marks omitted)).

The district court did not err. As a result, Mr. Palillero's cumulative error claim fails.

### III.    CONCLUSION

We AFFIRM Mr. Palillero's conviction and sentence.

Entered for the Court


Carolyn B. McHugh
Circuit Judge